Amy J. WOSINSKI, Eric Wosinski, a minor and
Steven J. Wosinski, Sr.,
Plaintiffs-Respondents,

GUHRING, INC.,
Plaintiff,

v.

ADVANCE CAST STONE Co. and Milwaukee County,
Defendants-Respondents,†

LIBERTY SURPLUS INSURANCE CORPORATION and
Liberty Insurance Underwriters, Inc.,
Defendants-Appellants.†

ESTATE OF Jared C. KELLNER, by his
Special Administrator and Dawn Kellner,
Plaintiffs-Respondents,

v.

MILWAUKEE COUNTY and Advance Cast Stone Co.,
Defendants-Respondents,†

LIBERTY SURPLUS INSURANCE CORPORATION and
Liberty Insurance Underwriters, Inc.,
Defendants-Appellants.†

Christopher KELLNER,
Plaintiff,

v.

† Petition for Review filed.

Advance Cast Stone Co.,
Defendant-Respondent,†

Liberty Surplus Insurance Corporation and
Liberty Insurance Underwriters, Inc.,
Defendants-Appellants.†

Amy J. Wosinski, Eric Wosinski, a minor,
Steven J. Wosinski, Sr. and Guhring, Inc.,
Plaintiffs,

v.

Milwaukee County, Liberty Surplus Insurance
Corporation, Liberty Insurance Underwriters,
Inc. and Advance Cast Stone Co.,
Defendants.†

Estate of Jared C. Kellner, by his
Special Administrator and Dawn Kellner,
Plaintiffs-Appellants,

v.

Milwaukee County, Liberty Surplus Insurance
Corporation, Liberty Insurance Underwriters,
Inc. and Advance Cast Stone Co.,
Defendants-Respondents.†

Christopher Kellner, Plaintiff,

v.

Advance Cast Stone Co.,
Liberty Surplus Insurance Corporation and
Liberty Insurance Underwriters, Inc.,
Defendants.†

597

Amy J. WOSINSKI, Steven J. Wosinski, Sr.
and Eric Wosinski, a minor,
Plaintiffs-Respondents-Cross-Appellants,

GUHRING, INC.,
Plaintiff,

v.

ADVANCE CAST STONE CO.,
Defendant-Appellant-Cross-Respondent,†

MILWAUKEE COUNTY, Defendant-Respondent,

LIBERTY INSURANCE UNDERWRITERS, INC. and
Liberty Surplus Insurance Corporation,
Defendants.†

ESTATE OF Jared C. KELLNER, by his
Special Administrator and Dawn Kellner,
Plaintiffs-Respondents,

v.

ADVANCE CAST STONE Co., Defendant-Appellant,†

LIBERTY INSURANCE UNDERWRITERS, INC., Milwaukee
County and Liberty Surplus Insurance
Corporation, Defendants.†

Christopher KELLNER,
Plaintiff,

v.

LIBERTY INSURANCE UNDERWRITERS, INC., Advance
Cast Stone Co. and Liberty Surplus Insurance
Corporation, Defendants.†

598

Amy J. WOSINSKI, Eric Wosinski, a minor, Steven J. Wosinski, Sr., Plaintiffs-Respondents-Cross-Appellants,

GUHRING, INC., Plaintiff,

v.

MILWAUKEE COUNTY, Defendant-Respondent,

LIBERTY SURPLUS INSURANCE CORPORATION, Defendant-Appellant,†

ADVANCE CAST STONE CO., Defendant-Respondent-Cross-Respondent,†

LIBERTY INSURANCE UNDERWRITERS, INC., Defendant-Appellant-Cross-Respondent.†

ESTATE OF Jared C. KELLNER, by his Special Administrator and Dawn Kellner, Plaintiffs-Respondents,

v.

MILWAUKEE COUNTY and Advance Cast Stone Co., Defendants-Respondents,†

LIBERTY SURPLUS INSURANCE CORPORATION and Liberty Insurance Underwriters, Inc., Defendants-Appellants.†

Christopher KELLNER, Plaintiff,

v.

ADVANCE CAST STONE CO., Defendant-Respondent,†

LIBERTY SURPLUS INSURANCE CORPORATION and Liberty Insurance Underwriters, Inc., Defendants-Appellants.†

Amy J. WOSINSKI, Eric Wosinski, a minor, Steven J. Wosinski, Sr. and Guhring, Inc., Plaintiffs,

v.

ADVANCE CAST STONE Co., Defendant-Respondent,†

LIBERTY SURPLUS INSURANCE CORPORATION and Liberty Insurance Underwriters, Inc., Defendants-Appellants,†

MILWAUKEE COUNTY, Defendant.

ESTATE OF Jared C. KELLNER, by his Special Administrator and Dawn Kellner, Plaintiffs,

v.

ADVANCE CAST STONE Co., Defendant-Respondent,†

LIBERTY SURPLUS INSURANCE CORPORATION and Liberty Insurance Underwriters, Inc., Defendants-Appellants,†

MILWAUKEE COUNTY, Defendant.

Christopher KELLNER, Plaintiff,

v.

600

Advance Cast Stone Co.,
Defendant-Respondent,†

Liberty Surplus Insurance Corporation and
Liberty Insurance Underwriters, Inc.,
Defendants-Appellants.†

Court of Appeals

*Nos. 2014AP1961, 2014AP2213, 2014AP2274, 2014AP2660,
2015AP1212. Oral argument January 31, 2017.
—Decided July 11, 2017.*

2017 WI App 51

610

613

On behalf of the appellant-cross-respondents Liberty Surplus Insurance Corporation and Liberty Insurance Underwriters, Inc., the cause was submitted on

the briefs of *Mark D. Malloy, Pamela J. Tillman,* and *Joshua J. Bryant* of *Meissner Tierney Fisher & Nichols S.C.* of Milwaukee, and *Michael B. Apfeld* of *Godfrey & Kahn S.C.* of Milwaukee. Orally argued by Mark D. Malloy and Pamela J. Tillman.

On behalf of the defendant-appellant-cross-respondents Advance Cast Stone Co., the cause was submitted on the briefs of *Matthew R. McClean* and *Elizabeth K. Miles* of *Davis & Kuelthau, S.C.* of Milwaukee, and *Laura E. O'Gorman* of *Schloemer Law Firm, S.C.* of West Bend. Orally argued by Laura E. O'Gorman.

On behalf of the respondent Milwaukee County, the cause was submitted on the brief of *Ross A. Anderson, Anthony J. Anzelmo,* and *Kurt M. Simatic* of *Whyte Hirschboeck Dudek S.C.* of Milwaukee. Orally argued by Michael B. Brennan.

On behalf of the plaintiff-respondents-cross-appellants Amy J. Wosinski, Eric Wosinski and Steven J. Wosinski, Sr., the cause was submitted on the briefs of *Timothy Andringa* and *Matthew M. Fernholz* of *Cramer, Multhauf & Hammes, LLP* of Waukesha. Orally argued by Timothy Andringa.

On behalf of the plaintiff-respondents-cross-appellants Estate of Jared Kellner and Dawn Kellner, the cause was submitted on the briefs of *Allan M. Foeckler, Brett A. Eckstein,* and *Sarah F. Kaas* of *Canon & Dunphy, S.C.* of Brookfield. Orally argued by Allan M. Foeckler.

Before Brennan, P.J., Kessler and Brash, JJ.

¶ 1. BRASH, J. Advanced Cast Stone (ACS) and its insurer, Liberty Surplus Insurance Corporation and Liberty Insurance Underwriters Inc. (collectively, "Liberty"), appeal the judgments as entered by the trial

court on July 11, 2014, regarding the liability for and damages resulting from the collapse of a concrete panel at the O'Donnell Park Parking Structure (O'Donnell Park). ACS was found to be primarily negligent for the failure of the panel, and relief was granted to the Estate of Jared Kellner and Dawn Kellner (collectively, "Kellner Plaintiffs"), to Steven J. Wosinski, Amy J. Wosinski, and Eric Wosinski (collectively, "Wosinski Plaintiffs"), and to Milwaukee County, as follows:

- Various compensatory damages to the Kellner Plaintiffs relating to the death of Jared Kellner, amounting to over $6.8 million;

- Various compensatory damages to each of the Wosinski Plaintiffs for their injuries, totaling over $11.4 million;

- Punitive damages to both the Kellner Plaintiffs and the Wosinski Plaintiffs in the amount of $15 million; and

- Compensatory damages to Milwaukee County for repairs to O'Donnell Park in the amount of $6 million.

The total damages award was over $39 million.

¶ 2. On appeal, ACS argues (1) that the claims were barred based on time limitations as set forth in Wis. Stats. §§ 893.89 and 893.43 (2015–16)[1]; (2) that there were several erroneous evidentiary rulings made during the course of the trial that prejudiced ACS; and (3) that certain damages are not sufficiently supported

---

[1] All references are to the 2015–16 version of the Wisconsin Statutes, unless otherwise noted. We acknowledge that there have been revisions made to the statutes since this event; however, these revisions did not affect the pertinent parts of the statutes that are relevant to the discussion in this opinion.

618

by the evidence and should therefore be dismissed or reduced, including the punitive damages award, the damages to the Estate of Jared Kellner for pre-death pain and suffering, and the damages to Milwaukee County.

¶ 3. Furthermore, Liberty appeals the trial court's finding rendered post-verdict with regard to insurance coverage issues: that there was coverage as a matter of law. Moreover, Liberty appeals the trial court's finding that Liberty had breached its duty to defend and duty of good faith and fair dealing, and was therefore responsible for the entire amount of the damages awarded in the verdict.

¶ 4. Additionally, the Kellner Plaintiffs and the Wosinski Plaintiffs filed cross-appeals on several issues: (1) that the pre-trial offer of settlement made by the Kellner Plaintiffs was valid; (2) that the Wosinski Plaintiffs are entitled to statutory interest on the entire judgment, including costs; and (3) that the statute of repose does not apply as a matter of law and, as such, summary judgment should have been granted.

¶ 5. Upon review, we reverse the trial court's finding that Liberty breached its duty to defend ACS. As a result, Liberty is responsible for coverage only to the extent provided in ACS's policy. Additionally, we conclude that there was no claim by ACS for breach of duty of good faith and fair dealing before the trial court; thus, its award of damages based on its finding that Liberty breached that duty is unsupported, and we therefore reverse that ruling as well.

¶ 6. We also reverse and remand on the issue of coverage for the damages awarded to Milwaukee County, as they are subject to the "your work" exclusion of the policy, and therefore further findings are necessary to itemize and categorize the damages. The jury verdict and all other rulings are affirmed.

¶ 7. This case stems from the tragic accident that occurred on June 24, 2010, at the O'Donnell Park parking garage in Milwaukee, where a large concrete panèl fell from the structure, killing Jared Kellner and injuring Steven, Amy, and Eric Wosinski.

¶ 8. On that afternoon, Steven Wosinski, together with his wife, Amy, their son, Eric, and Eric's friend, Jared Kellner, had parked their vehicle at O'Donnell Park to spend the evening at Summerfest. They were exiting the parking garage when one of the decorative concrete panels—specifically, the panel designated as 56AL, weighing approximately 13.5 tons and measuring over thirty-three feet long—fell from the structure. It crushed Jared Kellner, killing him. It also caught Amy Wosinski in the back of the left heel, which ultimately led to her lower left leg being amputated below the knee. Eric Wosinski suffered a broken right leg in his escape from the falling panel. All of this was witnessed by Steven Wosinski.

¶ 9. Milwaukee County, which owns O'Donnell Park, closed it immediately after the accident, and began an investigation to determine the reason that Panel 56AL had fallen. The investigation focused on the manner in which Panel 56AL, as well as the all of the other concrete panels in the structure, had been constructed and installed. O'Donnell Park was closed for over a year while this investigation ensued and the necessary repairs were completed.

*Construction of O'Donnell Park*

¶ 10. Milwaukee County began the construction process on O'Donnell Park in the late 1980's, hiring J.H. Findorff & Sons, Inc. (Findorff) in July 1987 as the

620

construction manager for the project. Milwaukee County also hired ACS to manufacture and install decorative concrete panels that hung on the side of the structure. ACS, in turn, hired Dietz Engineering, Inc. (Dietz), to design those panels. The panel design specifications prepared by Dietz indicated the size of each panel, the reinforcing of the panels, and the hardware that was to be used to connect each panel to the structure.

¶ 11. When investigators examined Panel 56AL after the accident, it was found that it was not manufactured and installed by ACS in accordance with Dietz's specifications. Dietz had called for a specific type of connector to be installed in the panel, a stainless steel coil rod into which a threaded pin would be inserted. Part of the pin was to protrude from the panel and connect with a stainless steel cup, referred to as a "sleeve," in the underlying concrete wall. Dietz's plan indicated that there should have been four connectors threaded with pins in each panel to be dropped into the sleeves in the concrete wall. The sleeves would then be filled with cement to form four solid connections. During the investigation, it was discovered that the coiled connectors specified in the plans had been replaced with smooth receiving tubes; thus, the threaded pins could not be inserted into the connectors and were missing from Panel 56AL.

¶ 12. As a result, during installation, instead of utilizing the "pin and sleeve" method referred to above, ACS instead used what is referred to as the "drill and pound" method to install Panel 56AL. This method involved drilling two holes through the panel and then pounding rebar through the drilled hole. This was not the method specified by Dietz—in fact, it was not a method recommended by the construction industry—

621

because it did not comply with the building code standards at that time for connecting a panel of that size. This issue was compounded by the manner in which the drill and pound method was executed to attach Panel 56AL: the holes were drilled too close to the edge of the concrete wall to attach the panel, which caused cracks in the concrete wall that further compromised the structural integrity of the panel. This was found to be a cause of the collapse of the panel.

¶ 13. These discrepancies were discovered immediately as investigators compared the connection hardware of the collapsed panel to the design drawings that had been submitted to Milwaukee County by ACS. The drawings on file with Milwaukee County, referred to as the "As-Built Drawings," showed the pin and sleeve method of connection as originally designed by Dietz; they did not reflect the change in connection method utilized by ACS.

¶ 14. These unreported deviations in the construction and installation of Panel 56AL indicated that ACS had not complied with its contractual duties for the O'Donnell Park project with Milwaukee County. In the first place, any deviations from the design specifications made during construction required that a change order be submitted in writing and approved prior to continuing work in those areas. Furthermore, ACS was obligated to maintain and update the As-Built Drawings on file with Milwaukee County, to reflect all changes made to the original plans for the structure. Moreover, Findorff and Milwaukee County denied that they had any knowledge that there had been a deviation from the design specifications with regard to the construction and installation of any of the panels.

¶ 15. Construction of O'Donnell Park was substantially completed in 1993. It was thereafter open to the public.

*Procedural Posture*

¶ 16. The Plaintiffs filed suit in January 2011.[2] They named as defendants ACS, Findorff, Dietz, and Milwaukee County, along with C.D. Smith Construction Company, Inc. (C.D. Smith), which designed the wall to which Panel 56AL was attached. The Plaintiffs alleged negligence on the part of the defendants, along with allegations of fraud, concealment, or misrepresentation relating to purported defects and deficiencies in Panel 56AL. They also included claims for punitive damages. Additionally, Milwaukee County filed a cross-claim for breach of contract against ACS for damages it incurred as a result of the accident.

¶ 17. At the time of the accident in June 2010, ACS was insured by Liberty. The coverage included a $1 million Commercial General Liability policy, together with $9 million in excess coverage. Thus, the total policy limits were $10 million.

¶ 18. The policy included a duty to defend up to the policy limits. It provided coverage for an "occurrence," defined as "an accident." However, it also included an intentional acts exclusion under which ' "[b]odily injury' or 'property damage' expected or intended from the standpoint of the insured" was not covered.

¶ 19. ACS tendered defense of this case to Liberty around July 2010, which Liberty accepted on November 18, 2011, but under a reservation of rights.

---

[2] Milwaukee County Circuit Court Case Nos. 2011CV1003, 2011CV1007, and 2012CV8327. The cases were consolidated.

In the reservation of rights letter, Liberty stated it believed that WIS. STAT. § 893.89, referred to as the statute of repose, would bar the negligence claims. The statute of repose states, in pertinent part, that "no action may be commenced ... against any person involved in the improvement to real property after the end of the exposure period," which is defined as "the [ten] years immediately following the date of substantial completion of the improvement to real property." WIS. STAT. § 893.89(1)-(2). Additionally, Liberty noted that coverage for claims relating to the allegations of fraud, concealment, and misrepresentation—allegations that would invoke an exception to the statute of repose—did not exist under the intentional acts exclusion.

¶ 20. ACS, Findorff, Dietz, and C.D. Smith moved for summary judgment in July 2012, primarily based on the statute of repose. They argued that the ten year exposure period barred the negligence claims because the construction of O'Donnell Park had been substantially completed nineteen years prior to the accident. ACS also moved for summary judgment against Milwaukee County's breach of contract claims, asserting the statute of limitations on contracts.

¶ 21. The Plaintiffs countered that summary judgment should be denied based on an exception to the statute of repose for "[a] person who commits fraud, concealment or misrepresentation related to a deficiency or defect in the improvement to real property." WIS. STAT. § 893.89(4)(a). Likewise, Milwaukee County argued that equitable estoppel applied to keep ACS from asserting the statute of limitations on contract claims on the same basis.

¶ 22. In its decision on these motions, the trial court dismissed C.D. Smith, finding that there was no

evidence of fraud, concealment, or misrepresentation on its part, and therefore the statute of repose barred the claims against it. The court also dismissed Dietz, again finding no evidence of fraud, concealment, or misrepresentation on its part, thereby invoking the limitation of the statute of repose. The court further noted that Dietz's contractual responsibilities were to ACS, not to Milwaukee County, so there was no contractual duty to disclose any design or installation changes of which they may have been aware.

¶ 23. However, the trial court denied the summary judgment motions of ACS and Findorff, finding there to be a material issue of fact as to whether there was concealment or misrepresentation on the part of either defendant with regard to the "defective or deficient manner" in which the panels were secured. The court also denied ACS's summary judgment motion relating to Milwaukee County's breach of contract claims on the same premise: that ACS was equitably estopped from asserting the six-year statute of limitations on contracts due to the existence of a material issue of fact as to whether ACS concealed or misrepresented the manner in which Panel 56AL was installed.

¶ 24. At the time these other dispositive motions were filed, Liberty never filed a declaratory judgment motion to argue its position on the issue of coverage, nor did it ever file a motion for bifurcation of the liability issues and the insurance coverage issues. However, Liberty reiterated its coverage position in its pretrial report, submitted prior to the final pretrial conference held on October 8, 2013. That pretrial report also included proposed special verdict questions relating to the fraud, concealment, and misrepresentation allegations against ACS, presumably to establish a potential trigger for the intentional acts exclu-

sion of the policy. The Kellner Plaintiffs objected to the questions and moved to bifurcate the coverage issues from the liability trial. They were joined by ACS in that motion.

¶ 25. The trial court granted the motion to bifurcate. It concluded that Liberty's apparent trial strategy would seriously undermine ACS's defense, particularly with regard to the punitive damages claims. Thus, the trial court determined that bifurcation was necessary and warranted. Additionally, the court ruled that Liberty's coverage counsel could not actively participate at the trial.

¶ 26. The jury trial lasted six weeks. In its verdict, the jury found that the negligence of several defendants had caused Panel 56AL to fail, and apportioned liability as follows: ACS: 88%, Milwaukee County: 2%, and Findorff & Sons: 10%.

¶ 27. Specifically, the jury found that ACS, Findorff, and Milwaukee County were all negligent with respect to either the construction or maintenance of O'Donnell Park, and that this negligence was a cause of the panel failure. Furthermore, the jury found that ACS had intentionally disregarded the Plaintiffs' rights, and awarded punitive damages. In addition to the punitive damages questions, the special verdict also asked whether ACS had "intentionally conceal[ed]" and "misrepresent[ed]" a "deficiency or defect in the panel installation at O'Donnell Park"; the jury answered in the affirmative.

¶ 28. Liberty filed several post-verdict motions, including a motion for declaratory judgment that they had no duty to indemnify ACS based on the jury's finding of intentional concealment and misrepresentation; a motion for declaratory judgment that Liberty had not waived its coverage defenses; a motion for a

new trial because Liberty had been barred from participating in the merits trial; a motion for reconsideration of the decision to have the same jury from the liability trial sit for a coverage trial; and a motion for recusal for any future coverage trial on this case. The other parties filed countering motions asserting that there was coverage as a matter of law.

¶ 29. The trial court completely rejected Liberty's arguments. At the motion hearing on February 10, 2014, the court granted the other parties' counter motions, ruling that there was coverage as a matter of law. In particular, it found that the panel collapse was an accident and thus qualified as an "occurrence" under the policy. Furthermore, the court found that regardless of the jury findings relating to concealment and misrepresentation, and the intentional disregard of the Plaintiffs' rights, there was no evidence supporting a contention that ACS "intended or was substantially certain that the panel would fall off," and therefore the intentional acts exclusion of the policy did not apply.

¶ 30. Moreover, the trial court found that although Liberty had provided a defense to ACS, its actions worked against ACS at trial. As a result, the trial court ruled that Liberty's conduct amounted to a breach of the duty to defend as well as the duty of good faith and fair dealing. This decision was based on Liberty's failure to move for bifurcation, together with its attempt to argue (based on the proposed special verdict questions submitted with its pretrial report) that ACS had installed the panels with the intent or substantial certainty that they would fall. In fact, the court stated that these actions by Liberty rendered its defense a "sham." The trial court therefore ruled that there was coverage up to the policy limits. Additionally,

it found that by committing these breaches, Liberty had "waived, [was] estopped, or [had] forfeited the right to interpose [its] coverage defenses."

¶ 31. However, the trial court did not stop there. At a subsequent post-verdict motion hearing on June 17, 2014, it ruled that Liberty's breach of its duties to ACS rendered them liable for "all damages that naturally flow from that breach." In other words, Liberty was obligated to pay the entire amount of the $39+ million judgment, regardless of policy limits.

## DISCUSSION

## I. ACS's Issues on Appeal

¶ 32. On appeal, ACS argues that the trial court erred on several different fronts. First, procedurally, ACS contends that the trial court erred in allowing the claims against it to go forward despite the limitations of the statute of repose and the statute of limitations on contract claims. Second, ACS alleges that there were several erroneous evidentiary rulings made during the trial. And third, ACS asserts that the trial court erred in entering judgment on the punitive damages and emotional distress damages awarded by the jury as well as damages awarded to Milwaukee County. As such, ACS seeks several means of relief: (1) all of the claims against it being dismissed; (2) a new trial; or (3) reversing the damages awards or amending the judgments on damages that were entered. We disagree and affirm.

### A. Time Restrictions on Claims

¶ 33. In its procedural arguments, ACS seeks a reversal of the trial court's summary judgment determination, or a reversal of the trial court's denial of

ACS's motion for directed verdict, such that all claims against ACS are dismissed. It asserts that the evidence is not sufficient to meet the standards required to apply the exception to the statute of repose set forth at Wis. Stat. § 893.89(4), allowing the Plaintiffs' claims, nor is it sufficient to apply equitable estoppel to Milwaukee County's claims.

 *1. There is sufficient evidence to support the jury's finding of concealment and misrepresentation on the part of ACS, thereby triggering the exception to the statute of repose.*

¶ 34. The statute of repose, set forth at Wis. Stat. § 893.89, imposes a time limit, referred to as the "exposure period," for bringing claims related to the improvement of real property. Wis. Stat. § 893.89(1). The exposure period runs for ten years after "the date of substantial completion" of the improvements. *Id.* No claims for injuries to person or property can be made against the owner of the property or any person involved in the improvements for any defect or deficiency related to the construction after the end of the exposure period. Wis. Stat. § 893.89(2).

¶ 35. However, there are several exceptions also set forth in the statute of repose. The statute is rendered inapplicable in cases where "[a] person . . . commits fraud, concealment or misrepresentation related to a deficiency or defect in the improvement to real property." Wis. Stat. § 893.89(4)(a). The burden of proving that an exception is applicable lies with the Plaintiffs. *Acuity Mut. Ins. Co. v. Olivas*, 2007 WI 12, ¶ 44, 298 Wis. 2d 640, 726 N.W.2d 258. We review the application of a statute to the fact of a case independently, but benefiting from the trial court's analysis. *See id.*, ¶ 25.

¶ 36. Although this accident occurred well after the ten-year exposure period had expired, as O'Donnell Park was substantially completed in 1993, we find there to be sufficient evidence in the record to support the jury's findings that triggered the concealment or misrepresentation exception. In the first place, the final As-Built Drawings filed with Milwaukee County reflect the original design of the panels by Dietz; they do not indicate the changes in the construction of Panel 56AL and the manner in which it was actually installed. Furthermore, there is testimony from an ACS employee, James Coates, who was the foreman of the O'Donnell Park project, that he discussed the changes in the installation of the panel with Erhardt Garni, the owner of ACS at that time, and they agreed not to put the changes in writing.

¶ 37. Moreover, there is also testimony from another ACS employee, Stanley Petts, with regard to the installation of the panels. Petts testified that he was called in by Coates to do some "backup drilling" on the panels where they were attached to the wall. Backup drilling is generally understood to mean the installation of *extra* pins in a panel, as opposed to the installation of the anchoring pins for the panel. Petts stated that the installation method he used in his "backup drilling" was not, on its own, a safe means of installing the panel. Thus, a reasonable inference drawn from this testimony is that Coates misled one of his own employees with regard to the installation method being utilized.

¶ 38. This evidence, reviewed cumulatively and together with the reasonable inferences that flow therefrom, is sufficient to support the jury's findings that ACS concealed and misrepresented the changes in the construction and installation of Panel 56AL. Con-

sequently, the exception to the statute of repose relating to fraud, concealment, or misrepresentation was triggered in this case, and, therefore, ACS's argument that the statute of repose bars the Plaintiffs' claims fails.

> 2. *It was not error for the trial court to apply equitable estoppel to bar ACS from asserting a defense based on the six-year statute of limitations for contracts against the claims of Milwaukee County.*

¶ 39. Generally, when "the facts are undisputed, or when the facts are disputed and the [trial] court's factual findings are not clearly erroneous, this court reviews the application of equitable estoppel *de novo.*" *Affordable Erecting, Inc. v. Neosho Trompler, Inc.*, 2006 WI 67, ¶ 21, 291 Wis. 2d 259, 715 N.W.2d 620 (italics added). "Proof must be clear, satisfactory, and convincing and must not rest on mere inference or conjecture." *Nugent v. Slaght*, 2001 WI App 282, ¶ 29, 249 Wis. 2d 220, 638 N.W.2d 594. "[O]nce the elements of equitable estoppel have been established as a matter of law, the decision to actually apply the doctrine to provide relief is a matter of discretion." *Id.*, ¶ 30.

¶ 40. The primary reason for applying equitable estoppel to bar a defendant from asserting the statute of limitations is when " 'the conduct and representations of [the defendant] were so unfair and misleading as to outbalance the public's interest in setting a limitation on bringing actions." ' *Hester v. Williams*, 117 Wis. 2d 634, 645, 345 N.W.2d 426 (1984) (citation omitted). There are four elements to be considered in applying equitable estoppel: " '(1) action or non-action, (2) on the part of one against whom estoppel is

asserted, (3) which induces reasonable reliance thereon by the other, either in action or non-action, and (4) which is to his or her detriment.' " *Nugent*, 249 Wis. 2d 220, ¶ 29 (citation omitted). Proof of actual fraud is not required. *State ex rel. Susedik v. Knutson*, 52 Wis. 2d 593, 597, 191 N.W.2d 23 (1971).

¶ 41. All of these elements are present in this case. The jury reasonably found, as discussed in the previous section, that ACS concealed and misrepresented changes in the construction and installation of Panel 56AL, and that this was a cause of its collapse. Thus, the first two elements of equitable estoppel are satisfied.

¶ 42. As to the third element, reliance, ACS argues that because Milwaukee County supervised this construction project, and that the County and Findorff should have seen how the connections were done on the installation of the panel, that the reliance element was not met. However, this does not take into consideration that ACS was contractually bound to disclose in writing any and all changes to the design that were made during the construction and installation process. Nor does it take into account that ACS filed final As-Built Drawings with Milwaukee County that did not reflect the changes that were made to Panel 56AL.

¶ 43. This evidence is sufficient to show that Milwaukee County did not know of the deviations to the construction and installation of Panel 56AL. The County reasonably relied on the provisions of its contract with ACS, and on the As-Built Plans that ACS filed that indicated that Dietz's design for the construction and installation of the panels had been adhered to. Moreover, it is reasonable to infer that this reliance was to Milwaukee County's detriment, the fourth

element, in that the County incurred the expense of having to pay for the investigation of the accident and the repairs to the panels, as well as the defense and prosecution of this action.

¶ 44. Because the record supports these jury findings, it was not an erroneous exercise of discretion for the trial court to apply equitable estoppel to bar ACS's statute of limitations defense. As a result, ACS's argument that Milwaukee County's claims are barred fails.

## B. Evidentiary Rulings

*1. The trial court did not err in instructing the jury that the testimony regarding an alleged ACS meeting during the construction of O'Donnell Park was not to be considered for the truth of the matter asserted.*

¶ 45. The testimony at issue relates to a discussion that Robert Hanson, an expert with the architectural and engineering firm of Fischer-Fischer-Theis, Inc., claims to have had with Allen Francois, an employee of INSPEC, Inc. Hanson was hired after the accident by Dietz, the firm that designed the concrete panels at O'Donnell Park, to inspect Panel 56AL and observe the removal of the remaining panels. INSPEC, Inc., an architectural and engineering firm, was hired by Milwaukee County after the accident to perform a forensic investigation into how and why Panel 56AL had fallen.

¶ 46. Hanson, who was named as a witness for ACS, claimed that Francois had told him in March 2011 about a meeting that allegedly had occurred sometime in 1990 during the construction of O'Donnell Park. At this alleged meeting, changes relating to the installation method that was ultimately employed for

Panel 56AL were purportedly discussed among the parties involved in the construction of O'Donnell Park. Hanson further stated that Francois had told him that there was no record of that meeting.

¶ 47. Neither Hanson nor Francois claimed to have attended the alleged meeting in 1990. In fact, not only was there no record of the alleged meeting, there were no witnesses who had personal knowledge of any such meeting.

¶ 48. The Plaintiffs objected to Hanson's testimony on hearsay grounds. In contrast, ACS contended that because Francois was an agent of Milwaukee County at the time of the conversation in 2011, it was an admission by a party opponent, and therefore not hearsay, pursuant to Wis. Stat. § 908.01(4)(b)4. The trial court agreed with ACS, but was nevertheless still concerned about the trustworthiness of the testimony: the source of Francois's knowledge about the alleged meeting did not involve personal knowledge, since INSPEC had not been hired by Milwaukee County until after the accident. Therefore, Francois would not have been present at the alleged 1990 meeting.

¶ 49. Francois, in his testimony about the alleged meeting, confirmed that his information about the alleged meeting was indeed from another source. He stated that he had heard about the alleged meeting from a Milwaukee Police Department detective who had investigated the accident. Francois testified that the detective had been told about the alleged meeting by James Coates, the ACS foreman for the project, and that the meeting had included ACS, Findorff, Dietz, and Milwaukee County. However, Francois denied having a conversation with Hanson regarding this information.

¶ 50. The trial court, which had considered allowing Hanson's testimony because it was based on the

admission of a party opponent, also considered allowing Hanson's testimony for impeachment purposes as a prior inconsistent statement because of Francois's denial of any conversation with Hanson. A prior inconsistent statement, like a party admission, is not hearsay. *See* WIS. STAT. § 908.01(4)(a)1.

¶ 51. Ultimately, the trial court allowed Hanson's testimony. However, with the testimony came a limiting instruction to the jury: it was to consider Hanson's testimony relating to the alleged meeting only to assess the credibility of Francois's testimony, because Francois had denied making that statement to Hanson. In other words, it was not to be considered as evidence that the alleged meeting had actually occurred.

¶ 52. The trial court's decision allowing Hanson's testimony with a limiting instruction was based on the fact that Francois's source of information was not in the records for O'Donnell Park, Milwaukee County, or any of the other contractors involved in the construction of O'Donnell Park. Instead, it was from a police detective investigating the accident, who was told about the alleged meeting by ACS's foreman, James Coates. The trial court found that having that intermediate level of hearsay as the source of the information was problematic for the application of the nonhearsay rules.

¶ 53. The decision by the trial court to admit a hearsay statement is discretionary and will not be reversed unless it is found to be an erroneous exercise of discretion. *State v. Ballos*, 230 Wis. 2d 495, 504, 602 N.W.2d 117 (Ct. App. 1999). Francois was an agent for Milwaukee County, and therefore his statement to Hanson regarding the alleged meeting was an admis-

sion of a party opponent, not hearsay. WIS. STAT. § 908.01(4)(b)1. However, the trial court ruled that because this admission was based on an intermediate level of hearsay—a source that had no personal knowledge of the alleged meeting—it was not sufficiently trustworthy to be admitted for the truth of the matter asserted. The court therefore allowed the testimony but with a limiting instruction to the jury to consider the testimony for credibility purposes only, and not as evidence that the meeting had actually occurred. This determination was a reasonable result based on the correct legal standard, and thus was within the trial court's discretion. *See Ballos*, 230 Wis. 2d at 504.

*2. The trial court properly admitted the As-Built Drawings.*

¶ 54. ACS contends that the As-Built Drawings submitted by the Plaintiffs at trial, identified as Exhibit 1 (a copy) and Exhibit 273 (the original), were inadmissible because a proper foundation linking the Drawings to ACS was never laid. We disagree.

¶ 55. Generally speaking, As-Built Drawings depict the actual design of a project as constructed. For the O'Donnell Park project, a set of final As-Built Drawings was contractually required to be submitted to Milwaukee County prior to Milwaukee County releasing payment to any contractor.

¶ 56. Beginning in April 1991, Findorff began requesting As-Built Drawings for certain portions of O'Donnell Park that were near substantial completion, including the construction and installation of the concrete panels by ACS.[3] There was a delay in obtaining

---

[3] These requests were initially made to Miller, Meier, Kenyon and Cooper, the original architects for the O'Donnell Park project; however, that firm was terminated in November 1991, and Graef, Anhalt, Schloemer & Associates, Inc., became

the Drawings, apparently due to confusion over the time frame for providing the Drawings (because not all phases of O'Donnell Park were substantially complete at that point), and because of cost concerns for producing multiple sets of the design plan such that each contractor could make any changes that had been implemented during construction.

¶ 57. On December 2, 1991, Findorff sent a letter to Erhardt Garni, the owner of ACS at that time, enclosing one copy of the design drawings with instructions to "annotate the drawings with any and all pertinent information and changes that reflect the AS-BUILT conditions." The marked-up drawings were then to be returned to Findorff to be forwarded to the architects, who in turn were to submit them to Milwaukee County, as required by the construction contract.

¶ 58. On December 19, 1991, Findorff submitted to the architects drawings "with AS-BUILT Notations." A Findorff employee, Dennis Walsh, testified that he had made the "As-Built" notation on the Drawings, but that he would not have done so without having received the Drawings back from ACS with a representation that the Drawings depicted the project as it had actually been constructed. Although there was no transmittal letter found from ACS stating that it was returning the Drawings to Findorff, the inference drawn from the December 2 transmittal letter to ACS from Findorff and Walsh's testimony was that the As-Built Drawings sent by Findorff to the architect on December 19 had come from ACS.

¶ 59. The significance of the As-Built Drawings lies in what was *not* depicted: there were no changes shown in the construction and the installation method

the architectural firm of record on the project. Neither of these firms was named as a defendant in this lawsuit.

<br>

used for Panel 56AL. Instead, they showed that the panel had been constructed and installed in accordance with the original design plan for the panels from Dietz. Of course, during the investigation into the accident, it became apparent that changes had in fact been made during the construction and installation of Panel 56AL.

¶ 60. Turning to the parties' arguments on appeal, as an initial matter the Plaintiffs claim that ACS failed to include in its post-verdict motions an argument relating to authentication, and has therefore forfeited its ability to challenge the admission of the As-Built Drawings on appeal, citing *Ford Motor Co. v. Lyons*, 137 Wis. 2d 397, 417, 405 N.W.2d 354 (Ct. App. 1987) ("[T]he failure to include alleged errors in the motions after verdict constitutes a waiver of the errors. This rule applies where a proper objection is made during the course of trial, but the error is not included in the motions after verdict.") (internal citation omitted). In the *Ford Motor* case, the defendant-appellant had included in his appeal allegations of error by the trial court in ruling that the issues raised in his counterclaim and cross-claim were inappropriate. *Id.* This court ruled that there was an insufficient factual basis in the record to overturn the trial court. *Id.* at 418.

¶ 61. The Plaintiffs are correct that issues that are not preserved are deemed waived. *State v. Huebner*, 2000 WI 59, ¶ 11, 235 Wis. 2d 486, 611 N.W.2d 727. The reasoning behind the waiver rule is to achieve several "important objectives," such as "[r]aising issues at the trial court level [to] allow[] the trial court to correct or avoid the alleged error in the first place, eliminating the need for appeal"; giving both parties and the trial court judge "notice of the issue and a fair opportunity to address the objection"; encouraging at-

torneys to "diligently prepare for and conduct trials"; and preventing attorneys from " 'sandbagging' errors, or failing to object to an error for strategic reasons and later claiming that the error is grounds for reversal." *Id.*, ¶ 12.

■■

¶ 62. In this case, ACS's objection to the admission of the As-Built Drawings was first made and argued in a motion *in limine* prior to trial; the trial court denied the motion. Although ACS did not make any additional arguments during post-verdict motions, its argument to the trial court during the pre-trial process met all of the objectives relating to the preservation of issues. *See Huebner*, 235 Wis. 2d 486, ¶ 11. Moreover, this court has since specifically stated that a party who raises an issue in a motion *in limine* "generally preserves the right to appeal on the issue raised by the motion without also objecting at trial. That is the purpose of a motion *in limine.*" *State v. Bergeron*, 162 Wis. 2d 521, 528, 470 N.W.2d 322 (Ct. App. 1991). Thus, we find that ACS sufficiently preserved this issue for appeal, and it is properly before this court.

¶ 63. ACS's arguments, in contrast, focus on the foundation laid for the admission of the As-Built Drawings. ACS asserts that it was reversible error for the As-Built Drawings to be allowed into evidence under the ancient documents rule. The ancient documents rule, an exception to the hearsay rule, permits the admission of documents that have been in existence for at least twenty years, upon establishing their authenticity. WIS. STAT. § 908.03(16).

¶ 64. There are three requirements that a document must meet to be admitted as an ancient document: (1) it must be "in a condition that creates no

suspicion concerning its authenticity"; (2) it was located "in a place where it, if authentic, would likely be"; and (3) it has "been in existence 20 years or more at the time it is offered." WIS. STAT. § 909.015(8).

¶ 65. There is no dispute that the age of the As-Built Drawings complies with the ancient documents rule, as they date back to 1991. Nor is there a dispute that they were located in a logical place; the Director of the Milwaukee County Architectural, Engineering and Environmental Services Section, Gregory High, who is the custodian of records of this type for the County, testified that at all times the As-Built Drawings were stored in flat files at various Milwaukee County facilities, as they should have been. Rather, ACS argues that the first requirement, regarding suspicion about authenticity, was not met in this case.

¶ 66. As noted in the previous section, the trial court's decision to admit a hearsay statement is discretionary and will not be reversed unless the trial court erroneously exercised its discretion. *State v. Joyner*, 2002 WI App 250, ¶ 16, 258 Wis. 2d 249, 653 N.W.2d 290. However, the determination of whether a statement is admissible under a hearsay exception is a question of law that we review *de novo. See id.*

¶ 67. ACS asserts that there is no definitive link between ACS and the As-Built Drawings, and therefore they do not meet the ancient documents requirement relating to suspicion concerning authenticity. The trial court disagreed, stating that ACS's concerns "do not rise to the level of any reasonable suspicion as to its authenticity." We agree with the trial court.

¶ 68. ACS's argument misconstrues the requirements of the ancient documents rule. The authentication requirement is " 'satisfied by evidence sufficient to support a finding that the matter in question is what its proponent claims.' " *Horak v. Building Servs. Indus. Sales Co.*, 2012 WI App 54, ¶ 9, 341 Wis. 2d 403, 815 N.W.2d 400 (quoting Wis. Stat. § 909.01). Here, there is no dispute that the As-Built Drawings are authentic design drawings of the O'Donnell Park construction project; rather, ACS's argument focuses on whether there was sufficient evidence to prove that they were submitted by ACS and not a different party. However, that is not an argument related to admission, but instead is a weight and credibility issue that is resolved by the fact-finder after weighing the evidence and determining the credibility of the witnesses who testified. The jury clearly did this, with its determinations reflected in the answers on the special verdict form. Accordingly, we find that the As-Built Drawings were properly admitted under the ancient documents rule.[4]

### 3. The trial court properly excluded evidence of a possible tow truck strike to Panel 56AL.

¶ 69. Shortly before the commencement of the trial, ACS sought to amend its witness list by adding Shay Lowney, who ACS asserted had seen a tow truck

---

[4] This court acknowledges that the Plaintiffs also claim that the As-Built Drawings were properly admitted as public records, pursuant to Wis. Stat. § 908.03(8). ACS briefly addresses this argument in its reply; however, the argument was not fully developed. In light of the fact that we have found the As-Built Drawings to be admissible under the ancient documents rule, we do not address the admissibility of the Drawings based on the public records exception.

at O'Donnell Park possibly strike Panel 56AL in the days prior to the accident. ACS also sought to add the record custodians for three tow truck companies to its witness list.

¶ 70. Because this request was outside of the deadline set forth in the scheduling order, ACS had to file a motion for relief from the scheduling order. The trial court denied the motion. It reasoned that the existence of this potential witness had been known for quite some time as the result of a story in the Milwaukee Journal Sentinel, and that an investigation into the identity of this potential witness should have been "timely pursued." As a result, ACS's "failure to timely pursue this information deprive[d] the opposing parties any reasonable opportunity to adequately respond" to the testimony presented by this witness. Therefore, the trial court found that no good cause had been shown for relief from the scheduling order.

■■■■■

¶ 71. The trial court "has both statutory and inherent authority to control its docket through a scheduling order." *260 N. 12th St., LLC v. State of Wisconsin DOT*, 2011 WI 103, ¶ 57, 338 Wis. 2d 34, 808 N.W.2d 372. "A party's failure to follow a scheduling order is grounds for sanctions at the [trial] court's discretion." *Id.*, ¶ 58. In determining an appropriate sanction, the trial court should "carefully consider[] the facts of record" and "balance[] any perceived prejudices that could result from its decision." *Id.*, ¶ 64. This court will uphold a discretionary decision " 'if the [trial] court has examined the relevant facts, applied a proper standard of law, and, using a demonstrated rational process, reached a conclusion that a reasonable judge could reach.' " *Hefty v. Strickhouser*, 2008 WI 96, ¶ 28, 312 Wis. 2d 530, 752 N.W.2d 820 (citation omitted).

¶ 72. In its review of ACS's motion, the trial court performed such an analysis. It found that this evidence could have been investigated in a more timely manner so that the time constraints of the scheduling order could have been met. Additionally, the trial court noted that allowing this witness would likely result in having to adjourn the trial to grant the opposing parties time to respond. The trial court recognized that adjourning a trial of this length (six weeks) with a significant number of witnesses (fifty-four were called) just days before it was scheduled to begin was not an insignificant prospect, with potential issues resulting from such a delay amounting to more than just a mere inconvenience to those involved. Therefore, because of the "inordinate prejudice to the opposing parties and the disruptive impact admission of this evidence would have on our ability to timely litigate the case," the trial court determined that exclusion of the evidence was warranted. We agree.

¶ 73. The trial court had the authority to make this decision, and did so after weighing the facts and circumstances against the potential prejudice that could result. Accordingly, we find that the trial court did not erroneously exercise its discretion in excluding this evidence.

## C. Damages Issues

*1. The evidence supports the jury's award of punitive damages.*

¶ 74. ACS appeals the award of punitive damages in this case, arguing that its conduct "amounted to nothing more than negligence." However, a cause of

action sounding in negligence does not necessarily preclude the award of punitive damages. *Brown v. Maxey*, 124 Wis. 2d 426, 432, 369 N.W.2d 677 (1985).

¶ 75. Instead, the standard for awarding punitive damages depends on whether it has been shown that a defendant "acted maliciously toward the plaintiff or in an intentional disregard of the rights of the plaintiff." Wis. Stat. § 895.043(3) (2009–10). Proving the intentional disregard of rights does not require evidence that a defendant " 'inten[ded] to cause injury to the plaintiff.' " *Strenke v. Hogner*, 2005 WI 25, ¶ 19, 279 Wis. 2d 52, 694 N.W.2d 296. Rather, the use of the word "intentional" in the statute is used to "describe the heightened state of mind required of the defendant who disregards rights, instead of the common law's description of 'wanton, willful and reckless.' " *Id.* In other words, there is "no requirement of intent to injure or cause harm" to award punitive damages. *Wischer v. Mitsubishi Heavy Indus. Am., Inc.*, 2005 WI 26, ¶ 24, 279 Wis. 2d 4, 694 N.W.2d 320.

¶ 76. Here, the jury determined that ACS had intentionally disregarded the rights of the Plaintiffs, and there is substantial credible evidence to support that finding. First, the evidence showed that ACS deviated from the construction and installation design plan for Panel 56AL as prepared by Dietz. Furthermore, ACS did not submit a change order to obtain approval for making these changes to the design plan, as contractually required.

¶ 77. Moreover, there was testimony that the method used by ACS to install Panel 56AL was not safe for a panel of that size, according to the building codes in effect at that time, a fact that should have been

known by ACS. In fact, Richard Dietz's testimony described the method of installation as "a ticking time bomb." Even an expert engineer testifying for ACS, H. Carl Walker, called the installation method used by ACS "dangerous."

¶ 78. In making the decision to deviate from the design plan for the construction and installation of Panel 56AL, without approval or disclosure, and utilizing a suspect installation method, ACS demonstrated a "heightened state of mind" that goes beyond ordinary negligence. *See Strenke*, 279 Wis. 2d 52, ¶ 19. In fact, this evidence indicates that ACS intentionally disregarded the Plaintiffs' rights to safety. *See Wischer*, 279 Wis. 2d 4, ¶ 30. Accordingly, we find that the jury reasonably concluded that punitive damages were warranted.[5]

2. *The evidence is sufficient to support the jury's award of damages for pre-death pain and suffering to the Kellner Estate.*

¶ 79. As an initial matter, we note that ACS's argument on appeal relating to this issue categorizes the damages as being for severe emotional distress; this is not accurate. The damages at issue were awarded to the Kellner Estate for pre-death pain and suffering. These are distinguishable claims.

¶ 80. The jury instruction for an estate's recovery for pain and suffering, WIS JI—CIVIL 1855, describes "pain and suffering" to include "all physical pain,

[5] We note that the trial court, during post-verdict motions, also discussed the amount of the punitive damages award, and whether it was excessive. However, on appeal the sole issue presented by ACS relates to the propriety of the award; ACS does not challenge the amount, and thus we do not discuss that issue.

645

worry and mental distress." The trial court expanded on that definition, explaining that the Kellner Estate "is entitled to be compensated fairly and reasonably for pain and suffering endured by Jared Kellner from the time he became aware of the impending harm, if he became aware of the impending harm, up to the time of death." The court further stated that "if Jared Kellner was not aware of impending harm at any time prior to his death, his estate is not entitled to compensation for any pre-death pain and suffering."

¶ 81. In contrast, a claim for the negligent infliction of severe emotional distress focuses only on mental suffering or anguish, which must be severe in order to be compensable. WIS JI—CIVIL 1511. The trial court noted the "procedural disparity" between the two types of claims, but found the case law relevant to severe emotional distress claims helpful in evaluating the issue of the pre-death pain and suffering damages awarded to the Kellner Estate.

¶ 82. The seminal case for severe emotional distress claims is *Bowen v. Lumbermens Mutual Casualty Co.*, 183 Wis. 2d 627, 517 N.W.2d 432 (1994). In *Bowen*, a fourteen-year-old boy was hit by a vehicle while riding his bicycle; he died at the hospital a short time after the accident. *Id.* at 634. The boy's mother sought damages for severe emotional distress for both herself, from seeing the immediate aftermath of the accident, and for her son's estate, for the moments just prior to the collision. *Id.* at 635.

¶ 83. After reviewing the then-current case law on the issue, and noting that the courts had "struggled" with analyzing severe emotional distress as a separate tort claim, the *Bowen* court established a

set of public policy considerations for courts to apply in their analyses. *Id.* at 638–54. These policy considerations include:

> (1) whether the injury is too remote from the negligence; (2) whether the injury is wholly out of proportion to the culpability of the negligent tortfeasor; (3) whether in retrospect it appears too extraordinary that the negligence should have brought about the harm; (4) whether allowance of recovery would place an unreasonable burden on the negligent tortfeasor; (5) whether allowance of recovery would be too likely to open the way to fraudulent claims; or (6) whether allowance of recovery would enter a field that has no sensible or just stopping point.

*Id.* at 655. The *Bowen* court summarized the application of these considerations as follows: "[w]hen it would shock the conscience of society to impose liability, the courts may hold as a matter of law that there is no liability." *Id.* at 656.

¶ 84. The *Bowen* court ultimately determined that the mother had stated a claim for which relief could be granted, but dismissed the claim of the son's estate. *Id.* at 660–62. The court found that there was no credible evidence relating to emotional distress that may have been suffered by the son. *Id.* Therefore, it was "mere speculation to assert that [the son] knew of the impending impact or suffered severe emotional distress in the moments before impact," and that "[a]llowance of recovery under the circumstances of this case would be too likely to open the way to fraudulent claims." *Id.* at 662. ACS relies heavily on this finding in its argument to vacate the damages awarded to the Kellner Estate for pre-death pain and suffering.

¶ 85. The trial court found here, however, that the facts of this case are distinguishable from *Bowen*. It noted the existence of credible evidence, namely the testimony of Steven Wosinski, who said that he looked at the eyes of both Jared Kellner and Eric Wosinski and saw that both boys were "very scared" and that "Jared looked terrified." Additionally, the trial court found that this "compelling" testimony was corroborated by other facts and testimony, including: the testimony of an independent witness, Reanne Bagemehl, who saw the panel collapse from across the street and estimated that it took three to five seconds from the time it started to fall to the time it landed on Jared Kellner; testimony regarding the loud "scraping" noise that the panel made while it was falling, as described by both Ms. Bagemehl and Steven Wosinski; and the twisting fractures to Eric Wosinski's leg that he suffered in trying to escape from the falling panel. There is further corroborating testimony from Dr. Brad Grunert, a clinical psychologist at the Medical College of Wisconsin and expert witness for the Plaintiffs. Dr. Grunert testified that there was "adequate time" for Jared Kellner to "process . . . what was about to happen to him" and experience a "profound sense of fear . . . where [he] underst[ood] the injuries about to occur [and] that there is nothing [he] [could] do to prevent that."

¶ 86. We agree with the trial court that the credible evidence relating to the pre-death pain and suffering of Jared Kellner distinguishes this case from *Bowen*. We therefore affirm the trial court's holding that the damages were properly awarded to the Kellner Estate for pre-death pain and suffering.

¶ 87. As an alternative to vacating the damages award, ACS seeks to have the damages reduced on grounds that the award is perverse, or at least excessive. We disagree.

¶ 88. A verdict is determined to be perverse "when the jury clearly refuses to follow the direction or instruction of the trial court upon a point of law, or where the verdict reflects highly emotional, inflammatory or immaterial considerations, or an obvious prejudgment with no attempt to be fair." *Redepenning v. Dore*, 56 Wis. 2d 129, 134, 201 N.W.2d 580 (1972) (footnote omitted). A trial court's confirmation of a verdict will be overturned only if it is found to have been the result of an erroneous exercise of discretion. *Id.*

¶ 89. ACS contends that the amount of the award was an emotional response by the jury, and therefore perverse. The trial court disagreed, noting that it was "overwhelmingly convinced" that the jury had "appropriately manage[d]" the emotional aspects of this case. We agree with the trial court, finding no evidence of any "inflammatory or immaterial considerations" or unfair prejudgment on the part of the jury in the record. *See id.*

¶ 90. ACS also argues that this award was likely an attempt by the jury "to circumvent the loss of society and companionship cap" on the Kellner Plaintiffs' wrongful death claim. This same argument was rejected by this court in *Hegarty v. Beauchaine*, 2006 WI App 248, 297 Wis. 2d 70, 727 N.W.2d 857. In *Hegarty*, the defendants sought to overturn damages in the amount of $7 million for pre-death loss of society and companionship that the jury had awarded to the

parents of a child who had died after suffering for two years and enduring eighty-nine surgeries as a result of a misdiagnosed complete bowel infarction. *Id.*, ¶¶ 12, 142. The defense asserted that the award was actually damages for emotional distress, a claim that the parents were prohibited from asserting. *Id.* The defendants further contended that the jury had ignored the instructions when considering the award for this claim. *Id.*

¶ 91. This court determined in *Hegarty* that the jury instructions were "abundantly clear" in explaining the considerations for awarding damages for pre-death loss of society and companionship, pointing out that it is presumed that a jury has followed instructions. *Id.*, ¶ 145. Therefore, this court found the *Hegarty* defendants' argument to be "nothing more than an unsupported speculation." *Id.*, ¶ 149.

¶ 92. The trial court came to the same conclusion in this case: "I find no merit as to . . . suggest that this jury was overcompensating on pre[-]death pain and suffering to makeup [sic] for the cap limitation on the Estate's wrongful death claim. They [sic] were properly instructed and I presume they [sic] followed the instructions." We agree with this conclusion.

¶ 93. Also in support of its argument that the award was perverse, ACS points to the "discrepancy" between the pre-death pain and suffering award to the Kellner Estate, and the award for severe emotional distress to the Wosinski Plaintiffs: the Kellner Estate was awarded $6.3 million in damages for pre-death pain and suffering, while Steven, Amy, and Eric Wosinski were awarded $1.5 million each for severe emotional distress. We disagree that this renders the award perverse, and refer to our earlier analysis regarding the differences in these claims; in short, the

nature of the claims, and the bases for awarding damages for each, is distinguishable.

¶ 94. In reviewing jury awards, courts are "required to presume the jury obeyed the instructions as given." *State v. Abbott Labs.*, 2012 WI 62, ¶ 103, 341 Wis. 2d 510, 816 N.W.2d 145. The trial court recognized this, and declared that the jury was "properly instructed as to what was compensable" and that it was "absolutely convinced" that the jury followed those instructions. We agree, and affirm the trial court's finding that the damages award to the Kellner Estate for pre-death pain and suffering was not perverse.

¶ 95. ACS alternatively argues that the award, if not perverse, was at least excessive. An award is excessive if it "reflects injuries not proved or 'a rate of compensation beyond reason.'" *Staskal v. Symons Corp.*, 2005 WI App 216, ¶ 38, 287 Wis. 2d 511, 706 N.W.2d 311 (citation omitted). "When a [trial] court rules on a motion challenging a damage award as excessive, the court is to view the evidence in the light most favorable to the jury's verdict." *Id.*, ¶ 39. To that end, if there is "any credible evidence under any reasonable view that supports the jury's finding on the amount of damages, the court is to affirm it." *Id.*

¶ 96. In support of its argument, ACS refers to the damages awarded for pain and suffering in *Wischer* for guidance. The *Wischer* case involved the deaths of three ironworkers during the construction of the retractable roof at Miller Park. *Wischer*, 279 Wis. 2d 4, ¶ 12. The men were in a basket held by a crane, tasked with bolting down the large pieces of the roof, when "Big Blue," an enormous crane that was hoisting a large roof panel, collapsed in high winds. *Id.* Big Blue

hit the basket the ironworkers were in as it collapsed, and they fell to their deaths. *Id.* The jury awarded the estates of the ironworkers $1.4 million each for pre-death pain and suffering.

¶ 97. In comparing the pre-death pain and suffering damages awarded to the Kellner Estate to those awarded in *Wischer*, the trial court admitted to "struggling" with the contrast; the Kellner Estate was awarded more than four times the amount that was awarded to each ironworker whose time period of "overwhelming [fear] and anguish . . . no question exceeded the period that Jared experienced." The trial court reasoned that although the award to the Kellner Estate "appears on its face to be excessive given the brevity of the terror and anguish" experienced by Jared Kellner, it "appears eminently reasonable given the enormity of the terror that this child suffered." As a result, although it was a "very close call," the trial court found that "the presumptive validity of the verdict compels that it be upheld."

¶ 98. " 'We afford special deference to a jury determination in those situations in which the trial court approves the finding of a jury.' " *D.L. Anderson's Lakeside Leisure Co. v. Anderson*, 2008 WI 126, ¶ 22, 314 Wis. 2d 560, 757 N.W.2d 803 (citation omitted). "Under our judicial system, we rely primarily upon the good sense of jurors to determine the amount of money which will compensate an individual for whatever loss of well-being he has suffered as a result of injury." *Id.*, ¶ 58 (citation omitted). Furthermore, it is not the task of the trial court, nor the task of this court upon review, to " 'substitute [its] judgment for that of the jury' "; rather, the courts are to " 'determine whether the award is within reasonable limits.' " *Id.* (citation omit-

ted; brackets in original). The trial court did just that in its analysis, and we affirm.

 *3. There is credible evidence to support the amount of damages awarded to Milwaukee County for breach of contract.*

¶ 99. Milwaukee County, after being named a defendant in this litigation, filed a cross-claim against ACS for breach of contract based on ACS's deviation in the construction and installation of Panel 56AL without the County's knowledge and without executing a written change order. The jury found that ACS had in fact breached its contract with Milwaukee County, and awarded compensatory damages in the amount of $6 million.

■

¶ 100. ACS argues that this amounted to a windfall for Milwaukee County. It contends that the County, in making a determination about what needed to be done with the remaining concrete panels similar to Panel 56AL that were still hanging at O'Donnell Park, could have chosen a "repair in place" option. This option, which did not involve replacing all of the panels around the façade of O'Donnell Park, could have been completed at a much lower cost. ACS also argues that the damages award did not take into account that Milwaukee County had performed no inspections or preventative maintenance on O'Donnell Park during the twenty years it had been in operation, and that it had significant deferred maintenance expenses.

¶ 101. As a result, ACS argues that the award puts Milwaukee County in a better position because of the breach than it would have been in had the contract been performed, which is not permitted under the law.

*See Hanz Trucking, Inc. v. Harris Bros. Co., Crestline Div.*, 29 Wis. 2d 254, 268, 138 N.W.2d 238 (1965). Accordingly, ACS asserts that the damages to Milwaukee County should be reduced to $4,239,786.00, which represents the County's full claim for lost revenue and investigation costs, plus the higher of two estimates received to repair the panels in place.

¶ 102. In contrast, Milwaukee County contends that the "repair in place" option was "entirely impractical . . . due to the serious public safety concern associated with the fatal panel failure." The County's experts testified that through their investigation and inspection of the remaining similar panels, about 100 total, they estimated that thirty-four percent of the panel connections had been installed in the same manner as Panel 56AL, and were in danger of failing. Additionally, many of the other panels had been installed using means other than the method that had been indicated by Dietz on the design plans; thus, there was no uniform consistency in how the panels were installed. Given this information, and the safety concerns involved, the County's experts agreed that repairing the panels in place was not the preferred method. Therefore, the County determined that, in the interest of public safety, all of the panels needed to be replaced.

■■■■■

¶ 103. The party injured by a breach of contract is entitled to recover damages that are a direct result of the breach, as well as those damages that "arise naturally from the breach." *Magestro v. North Star Envtl. Const.*, 2002 WI App 182, ¶ 10, 256 Wis. 2d 744, 649 N.W.2d 722. Those naturally arising damages, referred to as "consequential damages," include "all

losses that are the natural and probable results of the breach." Wis JI—Civil 3710.

¶ 104. The trial court denied ACS's post-verdict motion to reduce the award. The standard of review is that if there is "any credible evidence under any reasonable view that supports the jury's finding on the amount of damages, the court is to affirm it." *Staskal*, 287 Wis. 2d 511, ¶ 39. In noting this standard, the trial court found:

> There's not only some credible evidence to support this determination, there is overwhelming evidence. While ACS'[s] experts are adamant that repair in [place] alternatives existed with respect to the panels, the County's experts were just as adamant that repair in place alternatives were not feasible, not economical, and most importantly, not safe.
>
> The jury could have accepted the opinions of ACS'[s] experts and did not . . . . They were also at liberty to accept the opinions of the County's experts and they did . . . .

¶ 105. We agree with the trial court that the evidence supporting the breach of contract damages to Milwaukee County is substantial and credible. We therefore affirm the award.

## II. *Liberty's Issues on Appeal*

¶ 106. We now turn to Liberty's issues on appeal. Liberty identifies numerous issues on appeal, most of which stem from the trial court's findings that there was coverage as a matter of law, and further, that Liberty had breached its duty to defend and duty of good faith and fair dealing, and was therefore liable for

the entire jury verdict. The remaining issues relate to the scope of Liberty's coverage with regard to the types of damages awarded.

## A. Contractual Issues

¶ 107. We agree with the trial court's finding that there is coverage as a matter of law. However, we reverse on the findings relating to the breaches of the duty to defend and the duty of good faith and fair dealing.

### 1. ACS's insurance policy with Liberty provides coverage as a matter of law.

¶ 108. A court's interpretation of an insurance policy "seeks to determine and give effect to the intent of the contracting parties." *American Family Mut. Ins. Co. v. American Girl, Inc.*, 2004 WI 2, ¶ 23, 268 Wis. 2d 16, 673 N.W.2d 65. "Insurance polices are construed as they would be understood by a reasonable person in the position of the insured." *Id.* Our review of the trial court's interpretation of the policy is a question of law that we review *de novo. See id.*

¶ 109. "When determining whether an insurance policy provides coverage, a court first looks to the initial grant of coverage." *Schinner v. Gundrum*, 2013 WI 71, ¶ 37, 349 Wis. 2d 529, 833 N.W.2d 685. If it is determined that there is an initial grant of coverage for the type of claim at issue, the court must then " 'examine the policy's exclusions to determine whether coverage has been withdrawn by an exclusion.' " *Id.* (citation omitted).

¶ 110. First, with regard to whether there is an initial grant of coverage, Liberty argued in its post-verdict motion that the jury's finding of intentional concealment and misrepresentation by ACS with regard to the installation of Panel 56AL rendered the panel's failure an intentional act, as opposed to an "occurrence" which is required under the policy to trigger coverage. The trial court rejected that argument. We agree with the trial court.

¶ 111. Under ACS's insurance policy through Liberty, coverage is triggered by an "occurrence," defined in the policy as "an accident." Although "accident" is not defined in the policy, our supreme court has previously provided the following insight: " '[t]he word 'accident,' in accident policies, means an event which takes place without one's foresight or expectation. A result, though unexpected, is not an accident; the means or cause must be accidental.' " *American Girl, Inc.*, 268 Wis. 2d 16, ¶ 37 (quoting BLACK'S LAW DICTIONARY (7th ed. 1999)). Additionally, the supreme court has also defined accident as " '[a]n unexpected, undesirable event' or 'an unforeseen incident' which is characterized by a 'lack of intention.' " *Doyle v. Engelke*, 219 Wis. 2d 277, 289, 580 N.W.2d 245 (1998) (quoting THE AMERICAN HERITAGE DICTIONARY OF THE ENGLISH LANGUAGE (3d ed. 1992)).

¶ 112. In this case, the jury found that a cause of the panel's failure was ACS's negligence in the installation of Panel 56AL, not its misrepresentation or concealment of the design deviations. As the trial court explained, the "concealment and misrepresentation contributed to the risk of harm in preventing discovery of ACS'[s] negligence," but the Plaintiffs' injuries and the property damage to O'Donnell Park were the result

of "an accident caused by the negligent conduct of ACS—an occurrence covered by the policy."

¶ 113. This lack of intent relative ACS's negligent installation of Panel 56AL is the reason Liberty's argument fails. Liberty compares ACS's conduct to that of the seller in a real estate transaction who made a negligent misrepresentation regarding the 100–year flood plain in *Everson v. Lorenz*, 2005 WI 51, 280 Wis. 2d 1, 695 N.W.2d 298. However, in *Everson*, the negligent act *was* the misrepresentation, which the court found by definition "requires a degree of volition inconsistent with the term accident." *Id.*, ¶ 19. The same analysis applies in the other case cited by Liberty, *Bruner v. Heritage Cos.*, 225 Wis. 2d 728, 593 N.W.2d 814 (Ct. App. 1999), a conversion action where the insured was not initially aware that the property was stolen. There the court held that a claim of conversion "necessarily involves the knowing or intentional conversion of property" and, therefore, "an allegation of conspiracy to convert, by definition, cannot be considered an 'accident.' " *Id.* at 738.

¶ 114. Both of these cases are distinguishable from this case in that the negligent conduct alleged was intertwined with an action that required some knowledge or intent. In contrast, the conduct found to be negligent in this case, ACS's installation of Panel 56AL, was a separate action from its misrepresentation and concealment of its deviation from the original design plans. *Cf. Strenke*, 279 Wis. 2d 52, ¶ 31 (In interpreting the revised punitive damages statute, specifically the phrase "intentional disregard of rights," our supreme court distinguished "intentional" as the modifier for "disregard of rights," and found that it did not require an intent to injure or cause harm. The court explained that the phrase "d[oes] not mean

the harm or injury suffered. Rather, it refer[s] to conduct, which in turn resulted in the harm or injury suffered.").

¶ 115. "[T]he determination of whether an injury is accidental under a liability insurance policy should be viewed from the standpoint of the insured." *Schinner*, 349 Wis. 2d 529, ¶ 52. Indeed, the courts have long recognized that "comprehensive general liability policies are 'designed to protect an insured against liability for negligent acts resulting in damage to third-parties.' " *Doyle*, 219 Wis. 2d at 290 (citation omitted). Therefore, courts have had "little trouble" concluding that it is reasonable for an insured to expect its insurance policy to include coverage for negligent acts. *Id.* After reviewing the arguments and the record from the standpoint of ACS, the trial court found no evidence that ACS "intended or was substantially certain that the panel would fall off and cause the catastrophic consequences." Thus, ACS's actions were negligent, as opposed to intentional, and are therefore deemed to be an occurrence, which in turn triggers the initial grant of coverage for the claims in this case.

¶ 116. Accordingly, we look to see whether there is an applicable exclusion that would preclude coverage. Liberty contends that the intentional acts exclusion of the policy, which excludes coverage for " '[b]odily injury' or 'property damage' expected or intended from the standpoint of the insured," is applicable in this case to preclude coverage. In support of its argument, Liberty cites *Pachucki v. Republic Insurance Co.*, 89 Wis. 2d 703, 278 N.W.2d 898 (1979), as

providing guidance for the application of the exclusion; however, the circumstances in *Pachucki* are distinguishable.

¶ 117. In *Pachucki*, the plaintiff's eye had been injured when he was struck by a "greening pin," a metal object that his friend had shot at him, similar to shooting a paperclip with a rubber band. *Id.* at 705. The friend's parents had a homeowners policy under which they sought coverage for this incident, but the insurance company denied coverage based on an intentional acts exclusion similar to that of ACS's policy with Liberty. *Id.* at 705–06. The trial court granted summary judgment in favor of the insurance company, holding that although the friend did not intend to hit the plaintiff in the eye, the greening pins were nevertheless fired with the intention of hitting the plaintiff, and therefore the exclusion was applicable. *Id.* at 712, 714.

¶ 118. The court further explained, however, that the exclusion would be inapplicable "if and only if the insured acts without any intent or any expectation of causing any injury, however slight." *Id.* at 714. That is the case with ACS's installation of Panel 56AL, because ACS did not intend or expect the panel to fail. Consequently, in this case the exclusion is inapplicable.

¶ 119. Liberty also asserts that the doctrine of fortuity creates a basis for denial of coverage. This doctrine, also referred to as the "known loss doctrine," is "based on the essential characteristic of insurance— that it insures risks, not certainties." *State v. Hydrite Chem. Co.*, 2005 WI App 60, ¶ 23, 280 Wis. 2d 647, 695 N.W.2d 816. The premise of this argument is that ACS's actions were intentional and substantially cer-

tain to cause the panel to fail. Again, that was not proven in this case, and thus this doctrine is not applicable.

¶ 120. In the same vein, Liberty asserts that the application of the exception to the statute of repose, that the ten-year limitation does not apply in cases of fraud, misrepresentation or concealment, precludes coverage. This argument fails for the same reason, because this conduct is separate and distinct from the negligent installation of the panel.

¶ 121. To reiterate the trial court's findings, there is no evidence that ACS intended to cause any harm whatsoever when it misrepresented and concealed its deviations from the original design plan for the concrete panels. In fact, the trial court found that the "only reasonable inference" that could be made from the evidence in the record is that ACS's purpose in making the misrepresentation was to "cut corners to save time and money." While this conduct "contributed to the risk of harm in preventing discovery of ACS'[s] negligence," the injuries were the result of "an accident caused by the negligent conduct of ACS," which constitutes an occurrence under ACS's policy with Liberty. As a result, we find that ACS's policy with Liberty provides coverage for this incident as a matter of law.

*2. Liberty did not breach its duty to defend ACS.*

¶ 122. After finding that there was coverage as a matter of law, the trial court went on to find that Liberty had breached its duty to defend ACS. This finding was based on Liberty's actions throughout litigation that the trial court believed undermined ACS's defense; namely, its decision not to move for bifurcation, and then subsequently its submission of proposed special verdict questions that asked whether

ACS had installed the panels with the intent or substantial certainty that they would fall, knowing that ACS was defending a punitive damages claim. In fact, the court stated that these actions by Liberty rendered its defense a "sham." We conclude that Liberty's strategic decisions relating to its defense of ACS do not rise to the level of a breach of the duty to defend.

¶ 123. Whether an insurer has breached a contractual provision of an insurance policy is a question of law which we review *de novo. See Newhouse by Skow v. Citizens Sec. Mut. Ins. Co.*, 176 Wis. 2d 824, 833, 501 N.W.2d 1 (1993). When an insured pays its premiums for insurance coverage, the insurer "assumes the contractual duties of indemnification and defense for claims described in the policy." *Elliott v. Donahue*, 169 Wis. 2d 310, 320, 485 N.W.2d 403 (1992). An insurer's duty to defend "is predicated on allegations in a complaint which, if proved, would give rise to recovery under the terms and conditions of the insurance policy." *Id.* at 320–21. Put another way, the duty to defend is based on the nature of the claim, and "has nothing to do with the merits of the claim." *Id.* at 321. This analysis is referred to as the "four-corners rule," which is also a question of law. *Marks v. Houston Cas. Co.*, 2016 WI 53, ¶ 36, 369 Wis. 2d 547, 881 N.W.2d 309.

¶ 124. Any doubt about the duty to defend "must be resolved in favor of the insured." *Elliott*, 169 Wis. 2d at 321. Indeed, an insurance company that refuses to defend an insured under these parameters "does so at its own peril." *Id.* However, there is no dispute that Liberty provided a defense for ACS; in fact, to date Liberty has spent close to $2 million on the defense of

662

ACS, and continues to defend ACS through this appeal process. Liberty provided this defense under a reservation of rights which noted its position regarding coverage: (1) that the statute of repose would bar the claims and therefore bar coverage; or (2) that there was no coverage for claims relating to the allegations of fraud, concealment and misrepresentation due to exclusions in the policy.

¶ 125. Thus, from an early point in this litigation, Liberty disputed whether there was coverage under the policy. An insurer that disputes coverage, and thus the duty to defend, has several options for protecting its own interests, with procedures that have been well established by the courts.

¶ 126. The preferred means of disputing coverage is for an insurer to "request a bifurcated trial on the issue of coverage while moving to stay proceedings on the merits of the liability action until the issue of coverage is resolved." *Liebovich v. Minnesota Ins. Co.*, 2008 WI 75, ¶ 55, 310 Wis. 2d 751, 751 N.W.2d 764. Other options include "seeking a declaratory ruling or agreeing to provide a defense under a reservation of rights." *Id.* The courts stopped short of making any of these procedures an "absolute requirement[]," but nevertheless would "strongly encourage[s] insurers wishing to contest liability coverage to avail themselves of one of these procedures rather than unilaterally refuse to defend." *Id.*

¶ 127. In its decision, the trial court focused on Liberty's failure to move for bifurcation, calling it "a compelled avenue to assert their coverage defense without wholly subverting ACS's ability to defend the merits of the claims against it, in particular the punitive damages claim." In the court's view, bifurca-

tion was necessary because "it would be fundamentally unfair . . . to have Liberty argue in a nonbifurcated proceeding, that their own insured was substantially certain that the panel would fall off on the heels of the Plaintiffs' argument that ACS intentionally disregarded their right to safe use of the building."

¶ 128. Liberty chose not to move for bifurcation, the preferred method for resolving coverage disputes. Still, in providing the defense under a reservation of rights, it followed one of the acceptable procedural steps, and in doing so fulfilled its duty to defend under the policy.

¶ 129. In fact, the relevant case law involving the duty to defend focuses on the issue of whether a defense was provided or not provided, as the case may be, by an insurance company. *See, e.g., Newhouse,* 176 Wis. 2d at 837 (holding that when a coverage decision is not final before the trial on liability and damages occurs, the insurance company must provide a defense); *Mowry v. Badger State Mut. Cas. Co.,* 129 Wis. 2d 496, 528, 385 N.W.2d 171 (1986) (holding that Badger State did not breach its duty to defend, because although it initially denied coverage because it believed that "coverage under the policy was fairly debatable," it then assumed the defense of its insured "after the coverage trial and after a jury determined that coverage existed"); and *Southeast Wisconsin Prof'l Baseball Park Dist. v. Mitsubishi Heavy Indus. Am., Inc.,* 2007 WI App 185, ¶ 48, 304 Wis. 2d 637, 738 N.W.2d 87 (where this court affirmed the trial court's finding that Travelers Insurance had breached its duty to defend by choosing not to provide a defense under a reservation of rights even after the trial court had determined that there were allegations raised in the amended complaint that triggered the duty).

¶ 130. The trial court here did not base its findings on case law specific to the duty to defend, however; instead, it concentrated on Liberty's conduct beyond the procedural steps. Relying on its "sense of fairness," it explained that by attempting to argue intent on the part of ACS, Liberty "wholly subvert[ed]" ACS's ability to defend the negligence claim. The trial court found this to be performing the duty to defend "only in name, not in substance," labeled it a "sham" defense, and concluded that it was a breach of the duty to defend.

¶ 131. The focal point of the trial court's finding of a breach of the duty to defend revolves around the actions of Liberty that the trial court found objectionable; in particular, Liberty's "strategic" decision not to move for bifurcation, and its purported attempt to undermine ACS's defense with its proposed special verdict questions regarding intent. Yet, the binding legal precedent for this issue does not provide support for such a finding; instead, it focuses on whether an insurer followed the proper procedure in providing a defense. As a result, we reverse the trial court's determination that Liberty breached its duty to defend ACS.

3. *The issue of whether Liberty breached its duty of good faith and fair dealing is a separate cause of action between ACS and Liberty.*

¶ 132. The courts have found that the duty of good faith and fair dealing is present in every contract, including insurance policies. *Anderson v. Cont'l Ins. Co.*, 85 Wis. 2d 675, 687, 271 N.W.2d 368 (1978). However, unlike the duty to defend, the duty of good faith "is not of any explicit term of the contractual obligations," but rather is "the implicit duty to act in

good faith in carrying out the insurance contract." *Roehl Transp., Inc. v. Liberty Mut. Ins. Co.*, 2010 WI 49, ¶ 43, 325 Wis. 2d 56, 784 N.W.2d 542.

¶ 133. When this duty of good faith has not been fulfilled, the insured may have a cause of action in bad faith against the insurance company. A bad faith claim " 'sounds in tort,' " in that it "arises out of a contractual arrangement but is not a contract action." *Id.*, ¶ 40. *See also Anderson*, 85 Wis. 2d at 686 ("bad faith conduct by one party to a contract toward another is a tort separate and apart from a breach of contract per se"). It is a separate cause of action between the insured and the insurer, as parties to the contract, which can arise in order to "protect holders of insurance policies against abusive, 'bad faith' practices of insurance companies in adjusting or settling liability claims against the insured when the interests of the insured are in the hands of the insurance company and may come into conflict with the insurance company's own interests." *Roehl Transp.*, 325 Wis. 2d 56, ¶ 44.

¶ 134. In its ruling that Liberty breached its duty to defend ACS, the trial court concentrated not on the fact that Liberty had provided the defense, but on Liberty's trial strategy. In fact, the trial court did not make separate findings with regard to the duty to defend and the duty of good faith and fair dealing, but instead intertwined the duties, using the same objectionable conduct as the basis for both findings.

¶ 135. Liberty argues that in making this determination, the trial court created (and resolved) a new cause of action: a bad faith claim against Liberty, on behalf of ACS. In contrast, ACS and the County, along with the Plaintiffs, have tailored their arguments on

appeal to track the trial court's rulings. However, neither the trial court nor the parties have provided any legal precedent allowing for these duties to be combined in such a manner. Furthermore, the courts have previously determined that they are separate issues:

> The question arises . . . whether an alleged breach of the implied duty of good-faith dealing is subsumed under the general question inquiring into breach of the contract. Stated differently, is a breach of the implied duty of good-faith dealing something separate from breach of the terms of the contract? We think it is.

*Foseid v. State Bank of Cross Plains*, 197 Wis. 2d 772, 794, 541 N.W.2d 203 (Ct. App. 1995).

¶ 136. There is nothing in the record indicating that a separate tort claim was filed by ACS against Liberty for the breach of its duty of good faith and fair dealing. In fact, in correspondence to the trial court during the course of the post-verdict proceedings, ACS noted that it had not filed a separate action against Liberty for such a claim. No party asserts otherwise in this appeal.

¶ 137. Therefore, we conclude that there was no tort claim against Liberty for a breach of good faith and fair dealing arising out of its insurance contract with ACS before the trial court in this matter. Rather, the trial court opined on an issue that was not before the court and, as such, the court's award of damages is merely *dicta,* and not a resolution of a matter before the court.

¶ 138. Therefore, we reverse the trial court's ruling that Liberty breached the duty of good faith and fair dealing in this case, and vacate the damages that were awarded based on that ruling.

## B. Scope of Coverage

¶ 139. Additionally, the trial court found that Liberty was liable for the entire amount of the judgment awarded by the jury, based on its finding that Liberty had breached its duty to defend ACS. However, our determination that Liberty did not breach its duty to defend means that Liberty is responsible for coverage only to the extent as provided in ACS's policy. To that end, we address Liberty's other arguments related to scope of coverage to the extent that they are relevant to the allocation of damages under the policy limits.

*1. The damages awarded to Milwaukee County are subject to the "your work" exclusion of the Liberty policy, and thus require an itemization of damages along with findings relating to which damages are covered.*

¶ 140. Liberty asserts that the damages awarded to Milwaukee County for the damage to O'Donnell Park related to the repair and replacement of Panel 56AL, as well as for the other similarly installed concrete panels, are not covered by the Liberty policy. It argues that the property damage does not qualify as an "occurrence" as defined under the policy, or, alternatively, that the "your work" exclusion precludes coverage, although Liberty states that its analysis under either theory is the same. Liberty argues that faulty workmanship is not an occurrence by definition, because it is not accidental conduct. Liberty also points to the Contractors Limitation Endorsement to its policy, which precludes coverage for damages arising from work included in the "products-completed operations hazard," which is defined as damage stemming from "your product" or "your work."

¶ 141. Milwaukee County responds that Liberty has waived its right to assert this exclusion due to the scheduling order violations found by the trial court during the post-verdict motion hearing, with respect to Liberty's failure to move to bifurcate the coverage and liability issues prior to trial. The trial court ruled that Liberty's overall conduct with regard to the issue of coverage had violated the scheduling order and discovery rules. This ruling came on the heels of the court's finding that Liberty had breached its duty to defend and duty of good faith and fair dealing owed to ACS, thereby waiving its right to dispute coverage issues.

¶ 142. The trial court ruled definitively that this was an occurrence under the policy. We agree, as set forth in our discussion regarding coverage as a matter of law, and therefore we reject that portion of Liberty's argument.

¶ 143. However, with regard to Liberty's assertion of the "your work" exclusion, we find that, in light of our ruling that Liberty did not breach its duty to defend ACS, Liberty did not waive its right to assert this exclusion as an affirmative defense. Therefore, it may be asserted by Liberty and applied to the damages awarded to Milwaukee County.

¶ 144. Both Liberty and the County agree that the guiding case on this issue is *Jacob v. Russo Builders*, 224 Wis. 2d 436, 592 N.W.2d 271 (Ct. App. 1999). In *Jacob*, the plaintiffs had suffered significant water damage to their home as the result of defective masonry work. *Id.* at 440. West Bend Mutual Insurance Company had issued a policy to the subcontractor who had performed the masonry work, Limbach Construction Company, that contained an exclusion substantially similar to the Contractors Limitation Endorsement issued by Liberty to ACS. *Id.* at 445.

¶ 145. The ruling in *Jacob* explained how to determine which categories of damages were directly related to the faulty workmanship and therefore precluded by the exclusion, and which were "collateral damages" recoverable under tort theories of liability. *Id.* at 448. For example, the court found that damages claimed by the owner which included "costs associated with investigating the cause of the damage, assessing the extent of the needed repairs, and repairing or replacing the defective work . . . were directly related to the repair and replacement of the defective work" and therefore not covered under the policy. *Id.* at 450 (internal citation and emphasis omitted). However, the court found that other types of damages such as those relating to "relocation costs, temporary repairs, loss of use and enjoyment of the residence, and repair of the interior of the residence" were not directly related to repair of the defective masonry. *Id.* at 451. Rather, these damages represent "collateral damage to the [plaintiffs'] other property (the interior of the residence) and the costs associated with addressing and correcting that situation" and, consequently, these damages "represent economic losses which can be recovered in tort." *Id.*

¶ 146. The *Jacob* court also discussed other categories of damages that it considered to be in a "gray area" of this analysis, such as "the expert fees relating to the investigation of the cause and extent of the damage and the refinancing costs." *Id.* The court found that the record did not provide sufficient information as to "whether these items represent damage wholly and directly related to repairing or replacing the defective work which is not covered, whether they represent collateral economic loss which is covered, or whether portions of these costs might fall into both

categories." *Id.* As a result, the case was remanded for further findings in accordance with the guidelines the court had set out. *Id.* at 451–52.

■

¶ 147. As we previously noted, the trial court found post-verdict that there was coverage as a matter of law up to the policy limits, and further, that Liberty had breached its duty to defend and duty of good faith and fair dealing, and had therefore waived its right to assert coverage defenses, including the "your work" exclusion. Nevertheless, this exclusion was raised during post-verdict motion arguments by the Wosinski Plaintiffs with regard to apportionment of damages under the policy limits. During that discussion, after noting that Liberty had waived the right to assert this coverage defense, the trial court recognized that at least some of those damages were likely not covered pursuant to the "your work" exclusion, which would affect the apportionment of the damages. At that time, the Plaintiffs and the County were ordered to inform the court within forty-eight hours with regard to reaching an agreement as to the categorization of the County's damages for apportionment purposes.

¶ 148. This does not appear to have happened. At the time of that deadline imposed by the trial court, the parties notified the trial court that they were still negotiating the issue. Then, the trial court subsequently ruled on June 17, 2014, that Liberty was liable for the entire judgment without revisiting this issue. Additionally, the appellate briefs submitted by the parties regarding this issue indicate that there was no itemization of the County's damages ever completed.

¶ 149. As a result, like the court in *Jacob*, we are unable to ascertain which of the County's damages are covered under the Liberty policy, and which would be

precluded by the "your work" exclusion. We therefore remand this issue to the trial court for findings that establish the nature of the damages awarded to Milwaukee County so that they may be categorized in accordance with the guidelines set forth in *Jacob*.

 *2. Punitive damages are covered by the Liberty policy.*

¶ 150. Liberty contends that punitive damages are not covered under its policy for ACS, using the same arguments it presented with regard to the initial grant of coverage and the intentional acts exclusion. As we have already rejected those arguments, we will not reiterate that discussion here, but it is on that same basis that we find that there is coverage for punitive damages under the Liberty policy.

 *3. The award of emotional distress damages to Steven Wosinski is covered by the Liberty policy.*

¶ 151. Liberty argues that its policy provides coverage for "bodily injury," and that there was no evidence that Steven Wosinski suffered any physical injuries in the collapse of Panel 56AL. "Bodily injury" is defined in the policy as "bodily injury, sickness or disease sustained by a person, including death resulting from any of these at any time." Liberty contends that some physical injury must accompany the emotional injuries to constitute bodily injury under the policy, citing *Knapp v. Eagle Property Management Corp.*, 54 F.3d 1272, 1284 (7th Cir. 1995).

¶ 152. On the contrary, the Wosinski Plaintiffs cite *Tara N. v. Economy Fire & Casualty Insurance Co.*, 197 Wis. 2d 77, 540 N.W.2d 26 (Ct. App. 1995), where this court concluded that a claim of psychological harm

on its own falls within the definition of "bodily injury" in an insurance policy:

> Mental, emotional or psychological conditions are commonly considered as sickness or disease by both lay persons and medical professionals. Such conditions are routinely treated by medical personnel employing medical procedures. A reasonable insured would understand such conditions to be included within the concepts of "sickness or disease" which the policy uses to define "bodily injury."

*Id.* at 87.

¶ 153. We find *Tara N.* to be controlling, and therefore the damages awarded to Steven Wosinski by the jury for his injuries are covered under the Liberty policy.

## III. *Plaintiffs' Cross-Appeals*

### A. Validity of Kellner Plaintiffs' Offer

¶ 154. The Kellner Plaintiffs' arguments in their cross-appeals relate to an offer of settlement that was presented by the Estate of Jared Kellner to ACS on November 4, 2011. The offer was for $999,999.99, together with an agreement to execute a *Pierringer*[6] release of all the Estate's claims against ACS; the offer was not accepted. At the end of the trial, ACS's portion of the damages awarded to the Estate by the jury totaled $9,299,474.67[7] and, accordingly, with that more favorable judgment, the Estate would be entitled

---

[6] *Pierringer v. Hoger*, 21 Wis. 2d 182, 124 N.W.2d 106 (1963).

[7] This amount was calculated by multiplying the damages by 88% (ACS's apportionment of negligence) and adding the Estate's share of the punitive damages award.

to interest on the amount of the judgment from the date of the offer to the date that the judgment is paid, pursuant to WIS. STAT. § 807.01. However, the trial court found the offer to be invalid, and thus denied the Estate's motion to impose interest.

¶ 155. The Kellner Plaintiffs appeal that decision, arguing that the offer was in fact valid. Additionally, upon a finding that the offer is valid, the Kellner Plaintiffs argue that the interest rate applied to the judgment should be twelve percent, as opposed to the current rate of one percent plus prime, a change that was enacted by the Wisconsin Legislature shortly after the offer of settlement was presented to the Estate. The Kellner Plaintiffs contend that applying the new interest rate retroactively would be unconstitutional.

¶ 156. "An offer of settlement is valid when it allows the offeree to fully and fairly evaluate the offer from his or her own independent perspective." *Pachowitz v. LeDoux*, 2003 WI App 120, ¶ 39, 265 Wis. 2d 631, 666 N.W.2d 88. The party who presents the offer must do so "in clear and unambiguous terms," and any ambiguity in the offer "is construed against the drafter." *Id.* Whether a settlement offer is valid involves statutory interpretation, and thus is a question of law which we review independently. *DeWitt Ross & Stevens, S.C. v. Galaxy Gaming & Racing Ltd. P'ship*, 2004 WI 92, ¶ 19, 273 Wis. 2d 577, 682 N.W.2d 839.

¶ 157. The Kellner Plaintiffs argue that because their settlement offer indicated that the Estate would execute a *Pierringer* release, it should be deemed "clear and unambiguous." They believe the terms of the release, and its effect on the counterclaim for contribution against ACS that had been filed by Findorff,

should have been understood by ACS. However, the trial court found that the offer was ambiguous because it was based on the execution of a *Pierringer* release that had yet to be drafted.

■

¶ 158. We agree. Although the attorneys involved in this case are undoubtedly well-versed with the general terms and effects of executing a *Pierringer* release, it is not reasonable for a party receiving an offer to have to make assumptions as to the specific terms that the release would include. In other words, a settlement offer simply cannot be "fully and fairly" evaluated when not all of the terms are included in the offer. *See Pachowitz*, 265 Wis. 2d 631, ¶ 39. We therefore affirm the ruling of the trial court that the settlement offer by the Kellner Estate was invalid. As a result, we do not reach the Kellner Plaintiffs' argument regarding the award of statutory interest from the date of the offer.

## B. Interest on Wosinski Plaintiffs' Offer

■

¶ 159. The Wosinski Plaintiffs in their cross-appeal argue that they are entitled to interest on the entire judgment, including costs. They cite Wis. Stat. § 814.04(4), which provides that a party who obtains a judgment for money will also receive interest "on the amount of the money judgment from the time of verdict . . . until judgment is entered," in conjunction with Wis. Stat. § 815.05(8), which mandates that interest be paid "on the amount recovered from the date of the entry of the judgment until it is paid."

¶ 160. On the contrary, Liberty asserts that this argument has already been rejected by this court. It

explains that for this argument to prevail, the phrase "amount recovered" would have to be construed as having the same meaning as the term "judgment." This court has previously reviewed that particular issue and concluded that these are "two different concepts." *American Motorists Ins. Co. v. R & S Meats, Inc.*, 190 Wis. 2d 196, 214, 526 N.W.2d 791 (Ct. App. 1994).

¶ 161. In *American Motorists*, we reviewed Wis. Stat. § 807.01(4), a supreme court rule, which addresses the accrual of interest from the date of an offer of settlement. That rule includes similar language to the statutes at issue here.[8] Our analysis of the issue was the same as that for statutory interpretation, where it is recognized that "[w]here the legislature uses similar but different terms in a statute, particularly within the same section, we presume it intended those terms to have different, distinct meanings." *American Motorists*, 190 Wis. 2d at 214. We further noted that if "the supreme court had intended the [] phrase 'amount recovered' to equate with the [] word 'judgment,' " it would have used the same word, but it did not. *Id.* Therefore, we concluded that they should be interpreted as distinguishable terms with different meanings.

¶ 162. In the present case, the trial court, citing *American Motorists*, held that interest accrues "solely on the amount of damages and not on the amount of damages plus taxable costs and interests." We agree, and affirm the trial court's decision that interest shall accrue on the amount of the damages awarded in the verdict only, exclusive of taxable costs and interest.

---

[8] WISCONSIN STAT. § 807.01(4) states, in pertinent part, that the interest will accrue after a *judgment* is entered "on the *amount recovered* . . . until the amount is paid." (Emphasis added.)

¶ 163. We also note that the Wosinski Plaintiffs include in their cross-appeal an argument relating to the construction of Panel 56AL; namely, that the panel was defective as a matter of law, and therefore the statute of repose does not apply. This argument, however, is presented as an alternative means of circumventing the statute of repose, in the event that this court reversed the jury verdict relating to the misrepresentation and concealment of the deviations in the construction and installation of Panel 56AL, findings which trigger that exception to the statute of repose. Because we upheld the jury's findings on this issue, we do not reach this argument.

## CONCLUSION

¶ 164. In sum, we reverse the trial court's finding that Liberty breached its duty to defend ACS and, as a result, Liberty is responsible for coverage only to the extent as provided in ACS's policy. Additionally, we find that the determination of whether Liberty breached its duty of good faith and fair dealing is a separate tort claim that is not before this court.

¶ 165. We reverse and remand on the issue of coverage for the damages awarded to Milwaukee County, as they are subject to the "your work" exclusion of the policy, and therefore further findings are necessary to itemize and categorize the damages, pursuant to the *Jacob* case, as explained in this opinion. All other issues are affirmed.

*By the Court.*—Judgments affirmed in part, reversed in part, and cause remanded for further proceedings.