COURT OF APPEALS
DECISION
DATED AND FILED

June 4, 2020

Sheila T. Reiff
Clerk of Court of Appeals

NOTICE

This opinion is subject to further editing. If published, the official version will appear in the bound volume of the Official Reports.

A party may file with the Supreme Court a petition to review an adverse decision by the Court of Appeals. *See* WIS. STAT. § 808.10 and RULE 809.62.

Appeal No.    2019AP103

STATE OF WISCONSIN

Cir. Ct. No.  2015CV382

IN COURT OF APPEALS
DISTRICT IV

---

SUSAN K. NEBERMAN AND THE ESTATE OF SEAN SCHALLER, BY DOUGLAS SCHALLER, PERSONALLY AND AS SPECIAL ADMINISTRATOR,

   PLAINTIFFS-APPELLANTS-CROSS-RESPONDENTS,

V.

ARTISAN AND TRUCKERS CASUALTY INSURANCE COMPANY AND HUNTER SCOTT,

   DEFENDANTS,

SCOTT MAAS AND AUTO OWNERS INSURANCE COMPANY,

   DEFENDANTS-RESPONDENTS-CROSS-APPELLANTS.

---

APPEAL and CROSS-APPEAL from a judgment of the circuit court for La Crosse County:  SCOTT L. HORNE, Judge.  *Affirmed*.

Before Blanchard, Graham and Nashold, JJ.

**Per curiam opinions may not be cited in any court of this state as precedent or authority, except for the limited purposes specified in WIS. STAT. RULE 809.23(3).**

¶1 PER CURIAM. This appeal is brought by plaintiffs Susan Neberman and the Estate of Sean Schaller, by Douglas Schaller, personally and as special administrator (collectively, Plaintiffs). Plaintiffs appeal a circuit court judgment entered in favor of the defendants Scott Maas and Maas's insurer, Auto Owners Insurance Company (collectively, Defendants).[1]

¶2 Plaintiffs brought this action following an automobile crash that resulted in the death of Sean Schaller, the son of Susan Neberman and Douglas Schaller, who was a passenger in a vehicle driven by Hunter Scott. A trial was held regarding liability for the crash and potential damages, and the jury found for Defendants on all issues. Plaintiffs filed post-trial motions, requesting a new trial on liability and damages, and requesting an evidentiary hearing and a new trial based on the jury's alleged exposure to extraneous prejudicial information.[2] The circuit court initially granted Plaintiffs' motion for a new trial only as to damages

---

[1] Other named defendants in this action are Hunter Scott and Artisan and Truckers Casualty Insurance Company (Artisan). However, they did not participate in the trial or in this appeal. The circuit court entered default judgment against Scott and, on the special verdict form, entered that Scott was negligent and that his negligence was a cause of Sean Schaller's death. At the trial, the jury was required to allocate fault between Maas and Scott. Because Scott was uninsured at the time of the accident, Sean Schaller's insurer, Artisan, made payments to Plaintiffs for medical treatment costs and Plaintiffs' bodily injury claim. Artisan filed a cross-claim and counterclaim demanding judgment through subrogation and/or contribution from Scott, Maas, and Maas's insurer. The circuit court entered judgment in Artisan's favor against Scott in the amount of $110,320.

[2] In their briefs, the parties occasionally refer to the extraneous prejudicial information issue as "jury misconduct." For the sake of clarity, and in keeping with the statutory language of WIS. STAT. § 906.06(2), we use the phrase "extraneous prejudicial information" in referring to this issue. All further references to the Wisconsin Statutes are to the 2017-18 version unless otherwise noted.

but denied the motion for a new trial on liability. However, at the request of the parties, the court subsequently concluded that, because Scott had filed for bankruptcy, a new trial solely on damages would be "futile and/or moot." The court denied Plaintiffs' motion with respect to the alleged jury exposure to extraneous prejudicial information without holding an evidentiary hearing. Plaintiffs appeal, and Defendants cross-appeal. We affirm.

## BACKGROUND

¶3      This case arises out of an automobile crash that occurred in 2014, near West Salem, Wisconsin. The vehicles that were primarily involved in the crash were driven by Maas and Scott. Maas, a retired over-the-road truck driver of over 40 years, had his eight-year-old granddaughter as a passenger in his vehicle. Scott was 19 years old at the time and had Sean Schaller as a passenger in his vehicle.

¶4      Maas testified as follows. He and Scott first encountered each other while driving in the same direction eastbound just outside of West Salem, on County Road B, a two-lane county trunk highway. Maas was traveling at the posted speed limit of 35 miles per hour when Scott passed him.

¶5      Scott and Maas continued to travel eastbound on County Road B, where the posted speed limit eventually increased to 55 miles per hour. When Maas entered the 55 miles per hour zone, he increased his speed to 55. Scott did not initially increase his speed to match the new speed limit, and Maas eventually caught up to him. Maas estimated that, when he approached Scott, Scott was traveling at approximately 45 miles per hour.

¶6      As he approached Scott, Maas decided to pass.  Maas testified that he could see clearly down the road that there was no oncoming traffic in the left lane.  Maas activated his turn signal and initiated his passing attempt in a legal passing zone, maintaining his speed of 55 miles per hour.  Maas believed Scott would continue to travel at approximately 45 miles per hour and that Maas would therefore have sufficient time to complete his pass within the passing zone.

¶7      According to Maas, before he attempted to reenter the right lane, he looked in his rearview mirror but did not see Scott.  Maas then checked his right mirror and looked over his right shoulder and saw that Scott was in his blind spot near his right rear wheel, appearing to be pacing Maas.  Maas initially wondered if he himself had slowed down in attempting to pass Scott.  Maas then sped up "a little bit" in order to complete the pass, but Scott sped up in turn, pacing Maas.  At some point before Maas could get back into the right lane, the passing zone ended.

¶8      While still attempting to pass, Maas saw an oncoming vehicle in the left lane near the crest of a hill.  Maas testified that he was fearful of a collision and that, in the face of Scott not letting him back into the lane and the oncoming vehicle getting close, he believed he was confronted with an emergency.  Maas could either slow down and attempt to pull in behind Scott, or further increase his speed and attempt to complete his pass.  Maas's primary concern was getting back into the right lane.  Although Maas testified that he could not be certain, he believed that at some point he considered that, if he slowed down and attempted to get behind Scott again, Scott might also slow to block him from getting back into the right lane.

¶9      Maas decided to speed up and complete his pass.  Maas successfully moved ahead of Scott and back into the right lane, then maintained his speed until

there were approximately 55 to 60 feet between the Maas and Scott vehicles. Having created this distance between himself and Scott, Maas testified that he "touched" his brakes "ever so slightly" to moderate his speed.

¶10    According to two other witnesses, after Maas completed his pass, Scott's car entered the left lane, which appeared to be an attempt by Scott to pass Maas. According to the two witnesses, Scott's vehicle did not appear to enter the left lane as an evasive maneuver to avoid hitting Maas's vehicle. Scott then reentered the right lane, but shortly thereafter lost control of his vehicle and the vehicle rolled over.

¶11    Neither Scott nor his passenger, Sean Schaller, was wearing a seatbelt, and both were ejected from the vehicle. Scott survived the crash, but Sean Schaller died at the scene. Schaller's father went to the scene of the crash shortly after it occurred but could not see his son's body from where police instructed him to stand.

¶12    After Sean Schaller's death, his parents, individually and on behalf of Sean Schaller's estate, filed this action against Maas, Scott, Maas's insurer, and Sean Schaller's insurer, alleging that Maas and Scott were both negligent and that their negligence caused Sean Schaller's death. Plaintiffs sought damages for (1) Sean Schaller's pain and suffering in anticipation of his own death; (2) both parents' loss of society and companionship with their son; (3) both parents' pecuniary damages; and (4) Schaller's father's severe emotional distress caused by observing the aftermath of the crash.

¶13    Before the case went to trial, Scott pled guilty in a criminal prosecution to negligent homicide by operation of a motor vehicle and he filed for bankruptcy. Scott did not file an answer to Plaintiffs' complaint, and the circuit

court entered default judgment against him. As a result of his bankruptcy and the default judgment, Scott did not participate in the trial in this case, leaving only Maas and his insurer as defendants in this appeal.

¶14 Relevant to this appeal, Defendants moved for partial summary judgment on Sean Schaller's alleged pain and suffering in anticipation of death and on Schaller's father's alleged bystander severe emotional distress. The circuit court granted Defendants' motion with respect to Schaller's pre-death pain and suffering but denied their motion regarding Schaller's father's severe emotional distress.

¶15 The remaining issues were tried before the jury. On the issue of liability, the parties offered competing theories about Maas's and Scott's conduct. Plaintiffs argued that the evidence showed that the primary cause of the accident was speed, which was a result of a "competition" between Maas and Scott. Additionally, Plaintiffs argued that, regardless of intent, Maas was negligent per se for speeding and passing in a no-passing zone. In support of these theories, Plaintiffs argued that, rather than an attempt to re-pass Maas, Scott's entering the left lane after Maas passed him was an evasive maneuver due to Maas pulling too closely in front of Scott and then applying his brakes.

¶16 Defendants did not contest that Maas was at some point speeding and completing a pass in a no-passing zone but argued that Maas's conduct was excused under the emergency doctrine. Defendants also argued that Scott's move into the left lane was an attempt to re-pass Maas, rather than an evasive maneuver.

¶17 Plaintiffs elicited extensive testimony on the damages issues. Defendants argued against the applicability of Plaintiffs' bystander severe

emotional distress claim but did not seriously contest Plaintiffs' damages related to pecuniary loss and loss of society and companionship.

¶18 At the close of evidence and arguments, the jury was asked to render verdicts on both liability and damages. Because Scott had pled guilty to negligent homicide by operation of a motor vehicle and default judgment had been entered against him, the court answered the Scott negligence question for the jury in the affirmative. This left the jury to resolve the following issues: (1) whether Maas and Scott had participated in a contest or competitive event; (2) whether Maas was negligent and, if so, whether such negligence was a cause of Sean Schaller's injuries; (3) if Maas was negligent, the apportionment of negligence between Maas and Scott; and (4) the amount of damages. The jury verdict form asked the jury to determine the amount of damages, regardless of whether it found that Maas was negligent. In response to questions from the jury during its deliberations, the court informed the jury that it was to determine the total amount of damages, regardless of who was responsible, and that it should not allocate or apportion the damages to particular defendants.

¶19 Following deliberations, the jury returned verdicts finding that Maas and Scott were not engaged in a contest or competitive event and that Maas was not negligent in the operation of his vehicle. The jury awarded no damages to Sean Schaller's parents for their pecuniary losses or for loss of society and companionship.

¶20 Plaintiffs filed a motion after the verdict seeking a new trial on grounds that the jury's finding of no damages was perverse; that the perversity permeated the entire verdict, including its finding that defendant Maas was not negligent; and that the circuit court improperly granted Defendants' request to

7

provide the jury with an instruction on the emergency doctrine. The circuit court denied Plaintiffs' request for a new trial but agreed with Plaintiffs that the jury's verdict awarding no damages to Sean Schaller's parents was perverse. However, at the request of the parties, the court further concluded that a trial on damages would be "futile and/or moot," given that the only party who was determined to be liable was Scott, who had filed for bankruptcy and obtained a discharge of any debts related to the accident. Plaintiffs also brought a motion for an evidentiary hearing and a new trial based on the jury's consideration of extraneous information, namely, Scott's bankruptcy. The circuit court denied the motion without a hearing.

¶21 Plaintiffs appeal the denial of their motion for an evidentiary hearing and a new trial. Defendants cross-appeal, challenging the circuit court's denial of their motion for partial summary judgment on the issue of Douglas Schaller's claim of severe emotional distress by observing the aftermath of the crash.

### DISCUSSION

¶22 Plaintiffs make the following five arguments on appeal: (1) the jury's alleged exposure to extraneous prejudicial information warrants an evidentiary hearing and a new trial; (2) all jury verdicts were perverse; (3) the circuit court erred in granting Defendants' requested jury instruction on the emergency doctrine; (4) the court erred in granting Plaintiffs' requested jury instruction regarding Sean Schaller's failure to wear a seatbelt; and (5) the court erroneously granted partial summary judgment on the issue of Sean Schaller's pre-death pain and suffering in anticipation of death.

¶23 Defendants argue in their cross-appeal that the circuit court erroneously denied partial summary judgment on the issue of Douglas Schaller's

alleged severe emotional distress from observing the aftermath of the accident in which his son was killed.

¶24    For the reasons that follow, we affirm the circuit court's determinations with respect to extraneous prejudicial information, perversity of the verdict, and jury instructions.  As a result, we need not address the remaining issues, pre-death pain and suffering and bystander emotional distress.

*I. Extraneous Prejudicial Information*

¶25    Following the verdict in this case, Plaintiffs filed a motion requesting an evidentiary hearing, and ultimately a new trial, on the ground that the jury had learned of Scott's bankruptcy and considered this extraneous prejudicial information during its deliberations.  *See generally **Manke v. Physicians Ins. Co. of Wis.***, 2006 WI App 50, ¶¶16-22, 289 Wis. 2d 750, 712 N.W.2d 40 (discussing the law regarding new trials based on jury exposure to extraneous prejudicial information).  The circuit court denied Plaintiffs' motion without holding an evidentiary hearing.  On appeal, Plaintiffs argue that the court erred in not granting their request for an evidentiary hearing.

¶26    An extraneous prejudicial information motion is analyzed under a two-step process.  First, the court must determine whether the testimony of any juror in support of the motion is competent under WIS. STAT. § 906.06(2).[3]

---

[3]  WISCONSIN STAT. § 906.06(2) provides:

> INQUIRY INTO VALIDITY OF VERDICT OR INDICTMENT. Upon an inquiry into the validity of a verdict or indictment, a juror may not testify as to any matter or statement occurring during the course of the jury's deliberations or to the effect of anything upon the juror's or any other juror's mind or emotions as influencing the juror to assent to or dissent from the verdict or

(continued)

*Manke*, 289 Wis. 2d 750, ¶18. Under the second step, the moving party must "assert facts that, if true, would require a new trial." *Id.*, ¶25. A moving party must make both showings to receive an evidentiary hearing. *Id.*; *State v. Marhal*, 172 Wis. 2d 491, 497-98, 493 N.W.2d 758 (Ct. App. 1992). We review de novo whether a party bringing a motion based on extraneous prejudicial information makes the showings required to receive an evidentiary hearing. *See Manke*, 289 Wis. 2d 750, ¶¶17, 19, 27; *see also State v. Miller,* 2009 WI App 111, ¶62, 320 Wis. 2d 724, 772 N.W.2d 188.

¶27 In order for a juror's testimony to be competent under the "extraneous information exception," the moving party must establish that three conditions are met. *Manke*, 289 Wis. 2d 750, ¶19. First, the juror testimony must concern "extraneous information (rather than the deliberative process of the jurors)." *Id.* (quoted source and internal quotation marks omitted). Second, the extraneous information must have been "improperly brought to the jury's attention." *Id.* And third, the extraneous information must be "potentially prejudicial." *Id.*, ¶¶19, 32.

¶28 Whether a new trial is warranted under the second step has a factual and a legal component. *Id.*, ¶21. As a factual matter, the circuit court must determine whether there is clear and convincing evidence that at least one juror

---

indictment or concerning the juror's mental processes in connection therewith, except that a juror may testify on the question whether extraneous prejudicial information was improperly brought to the jury's attention or whether any outside influence was improperly brought to bear upon any juror. Nor may the juror's affidavit or evidence of any statement by the juror concerning a matter about which the juror would be precluded from testifying be received.

10

actually received the extraneous information. *State v. Eison*, 194 Wis. 2d 160, 177, 533 N.W.2d 738 (1995). We affirm the circuit court's findings of fact unless those findings are clearly erroneous. *Manke*, 289 Wis. 2d 750, ¶21. If the circuit court concludes that a juror received extraneous information, the court must then determine the legal question of whether the information was prejudicial. *Id.*, ¶22. Because this is a question of law, our review is de novo. *Id.*

¶29    The test for prejudice under the second step is objective; the court does not examine whether any juror was *actually* prejudiced by the extraneous information because that would require an inquiry into the substance of deliberations, a topic on which the jurors are not competent to testify. *See id.*, ¶¶22, 45; *see also After Hour Welding, Inc. v. Laneil Mgmt. Co.*, 108 Wis. 2d 734, 324 N.W.2d 686 (1982). Rather, the test for prejudice in a civil case is whether there is a "reasonable probability that the extraneous information would have a prejudicial effect upon a hypothetical average juror." *See Manke*, 289 Wis. 2d 750, ¶¶22, 37. When evaluating the probability of prejudice, courts consider factors such as the "nature of the extraneous information, the circumstances under which it was brought to the jury's attention, the nature of the plaintiff's case and the defense, and the connection between the extraneous information and a material issue in the case." *See id.*, ¶51 (quoting *Castaneda v. Pederson*, 185 Wis. 2d 199, 212-13, 518 N.W.2d 246 (1994) (internal quotation marks omitted)).

¶30    In this case, the factual basis for Plaintiffs' extraneous prejudicial information claim consists of two affidavits regarding an alleged conversation between Plaintiffs' attorney and a juror, which occurred several weeks after the trial. The pertinent parts of the affidavits, identical in substance, state:

> [The juror] stated that during their deliberations the jurors
> learned    that    Defendant    Hunter    Scott    had    filed    for

> bankruptcy. Although [the juror] could not remember how the jurors had learned of Mr. Scott's bankruptcy, she stated that the jurors discussed and considered Mr. Scott's bankruptcy during their deliberations.

¶31 The circuit court concluded that the information contained in the affidavits was not competent because it was not "potentially prejudicial" as required by the first step of the extraneous prejudicial information analysis. *See Eison*, 194 Wis. 2d at 172-73. "Potentially prejudicial" information is "'information that conceivably relates to a central issue of the trial,'" a lower standard than the standard for prejudice when deciding whether a new trial is warranted. *Manke*, 289 Wis. 2d 750, ¶32 (quoting *State v. Broomfield*, 223 Wis. 2d 465, 478, 589 N.W.2d 225 (1999) (internal quotation marks omitted)).

¶32 We decline to address whether the circuit court erred in finding no prejudice under the first step of the extraneous information analysis because we conclude that the jury's knowledge of Scott's bankruptcy was not prejudicial as a matter of law under the second step and that Plaintiffs were therefore not entitled to a new trial or an evidentiary hearing. *See State v. Baudhuin*, 141 Wis. 2d 642, 648, 416 N.W.2d 60 (1987) (appellate court may affirm circuit court's ruling on question of law on different ground than that relied on by circuit court).

¶33 On the issue of prejudice, Plaintiffs argue that knowledge of Scott's bankruptcy could cause the jury to base its verdict on improper grounds, namely, Scott's bankruptcy status. Plaintiffs assert that, "because Maas was the driver of a non-contact vehicle and Scott was the driver of the only vehicle involved in the collision, the basis for Plaintiffs' claims against Maas may not have been intuitively obvious to the average person unfamiliar with the case." Plaintiffs argue that knowledge of Scott's bankruptcy played into what they contend was the defense's suggestion that Plaintiffs were unfairly seeking to establish liability by

Maas only because they could not collect damages from the bankrupt Scott. In support, Plaintiffs point to the second paragraph of the following statement made by Defendants' counsel during closing argument, which commented on Plaintiffs' argument that the jury should find Scott 25% responsible and Maas 75% responsible for the crash:

> [F]or whatever reason, this young man, Mr. Scott, who took Sean Schaller into his car and was entrusted with his safety and for no reason whatsoever escalated and tried to block Mr. Maas from coming back in, who took the bait if nothing else, and accelerated and accelerated and ultimately tried to repass and flips his car, ejecting his friend, his best friend, and killing him, he's only got 25 percent of the fault? Honestly, as a parent under these circumstances, would you really say that Hunter Scott only has 25 percent of the fault under these facts? Why is he not the primary person responsible for this accident?
>
> There's a reason. But it has nothing to do with the truth. There's a reason that they're piling on Mr. Maas. There's a reason that they're grasping at straws. And I think you know what it is.

¶34 We agree with Defendants that Plaintiffs have not demonstrated a "reasonable probability" that Scott's bankruptcy would have a prejudicial effect upon a hypothetical average juror. *See **Manke***, 289 Wis. 2d 750, ¶37. We first note that counsel's statements during closing argument did not mention bankruptcy. Furthermore, the jury was instructed that the attorneys' remarks, closing arguments, and opinions are not evidence, and that the jury must decide the case on the evidence presented and on the court's instructions. Jurors are presumed to follow jury instructions. ***State v. LaCount***, 2008 WI 59, ¶23, 310 Wis. 2d 85, 750 N.W.2d 780.

¶35 We further observe that the comments Plaintiffs refer to were isolated, brief, and made in the context of a lengthy closing argument focused on

13

the evidence, following a five-and-a-half-day trial during which Scott's bankruptcy was not mentioned. Placed in context, and considering "'the nature of the plaintiff's case and the defense,'" *see* **Manke**, 289 Wis. 2d 750, ¶51 (quoted source omitted), it cannot be said that Defendants' theory of the case was that Plaintiffs sued Maas and his insurer only because Scott was bankrupt. In fact, at the hearing on Plaintiffs' post-verdict motions, Maas's counsel noted: "I was the one who asked that [the bankruptcy] information be kept from the jury because I didn't want them to know that we were the last ones standing" in terms of a potential recovery. In denying the motion for an evidentiary hearing, the circuit court agreed with Defendants that, if a jury were to consider Scott's bankruptcy, such consideration would be more likely to prejudice Defendants rather than Plaintiffs. The court stated:

> [I]f there were consideration of the fact of bankruptcy, it's something that would operate more to the detriment of … the defense. I think it's far more likely that a jury would consider that Mr. Scott had declared bankruptcy, exercised some sympathy towards the plaintiff[s] and been more likely to reach a verdict that was contrary to Mr. Maas in an effort to insure some recovery on the part of the plaintiffs.

¶36 Plaintiffs have also failed to show a "'connection between the extraneous information and a material issue in the case.'" *See* **id.** As noted by Defendants, Scott's bankruptcy has no bearing on the fault of either Scott or Maas for the accident, nor does it have a bearing on the issue of damages. It does not relate in any way to the question of whether the decedent, Sean Schaller, provided society and companionship or pecuniary services to his parents, nor does Scott's bankruptcy affect whether Schaller's father suffered bystander severe emotional distress.

¶37 Rather than arguing that the bankruptcy information was relevant to the issues the jury was required to determine, Plaintiffs assert that they "are entitled to an evidentiary hearing <u>because</u> the information <u>has no bearing</u> on any issues the jury was asked to determine and would likely cause a hypothetical juror to decide the case on an improper basis." Plaintiffs provide no authority for the assertion that they are entitled to an evidentiary hearing on extraneous prejudicial information grounds even when the information has no bearing on the issues for jury determination. Based on the record in this case, we conclude that the issue of Scott's bankruptcy has too tenuous a connection to any of the central issues at trial for this court to determine that there is a "reasonable probability that the extraneous information would have a prejudicial effect upon a hypothetical average juror." *See id.*, ¶37.[4]

¶38 Because the jury's alleged knowledge that Scott had filed for bankruptcy was not prejudicial under the second step of the extraneous prejudicial information analysis, and Plaintiffs therefore would not have been entitled to a new trial, we affirm the circuit court's order denying Plaintiffs' request for an evidentiary hearing. *See id.*, ¶25.[5]

---

[4] Plaintiffs rely heavily on what they submit is the high persuasive value of a Rhode Island Supreme Court decision, *Anderson v. Botelho*, 787 A.2d 468 (R.I. 2001). However, *Anderson* is readily distinguishable, including because that case involved repeated violations of a trial court order excluding references to bankruptcy and because bankruptcy played a central role in the defense, whereas here Scott's bankruptcy played little or no role in the defense.

[5] As a result of our conclusion that Plaintiffs have failed to show prejudice, we need not consider Defendants' alternative arguments on this topic.

## II. Verdict Perversity

¶39     Plaintiffs argue that the jury's verdict is perverse in its entirety and that the circuit court should have granted their request for a new trial, including on the issue of liability. *See Fouse v. Persons*, 80 Wis. 2d 390, 259 N.W.2d 92 (1977) (discussing verdict perversity). The circuit court agreed with Plaintiffs that the verdict awarding Plaintiffs zero damages was perverse because it was unsupported by the evidence. However, the court rejected Plaintiffs' arguments that the perversity with respect to damages permeated the jury's verdict on liability. The court therefore initially granted Plaintiffs' motion for a new trial on the issue of damages but not with respect to liability. At the request of the parties, however, the court concluded that, because Scott was bankrupt and the jury found that Maas was not negligent, a trial on damages would be "futile and/or moot" and therefore would not be held.[6] On appeal, Plaintiffs argue that the perversity of the damages verdict permeated the entire verdict and therefore the circuit court should have ordered a new trial on all of the issues, including with respect to Maas's liability.

---

[6] The mootness ruling originated at the request by the parties during the hearing on Plaintiffs' post-verdict motions. In response to the circuit court's oral ruling granting a new trial on the issue of damages but not on liability, Plaintiffs stated that "rather than receiving a new trial on the issue of damages, ... [they] would just prefer a categorical denial then of their motion [for] a new trial." Defendants agreed that a trial on the issue of damages was "a waste of everyone's time if that liability decision holds up" and inquired whether "a trial on damages could take place at some future date after the Court of Appeals weighs in," and whether the circuit court would consider signing an order ruling that the issue of damages was moot as a result of the liability ruling. The circuit court responded by asking the parties to come up with an order and submit it to the court. The resulting order states that Plaintiffs' motion for a new trial based on inadequacy of damages is granted but that the court "will not conduct a re-trial on damages only, because it would be MOOT AND/OR FUTILE."

¶40    "A perverse verdict is one which is clearly contrary to the evidence." *Nelson v. Fisher Well Drilling Co.*, 64 Wis. 2d 201, 210, 218 N.W.2d 489 (1974). "A verdict is perverse when the jury clearly refuses to follow the direction or instruction of the trial court upon a point of law, or where the verdict reflects highly emotional, inflammatory or immaterial considerations, or an obvious prejudgment with no attempt to be fair." *Id.* (quoted source and internal quotation marks omitted). When a circuit court finds that one part of a verdict is perverse, it is "presumed that all of the jury's answers are affected, unless the trial court finds otherwise and states [its] reasons for finding that the perversity is confined to one part of the verdict." *Fouse*, 80 Wis. 2d at 401; *see also Spath v. Sereda*, 41 Wis. 2d 448, 451-52, 164 N.W.2d 246 (1969). We review a circuit court's determination of perversity and whether it permeated the entire verdict for an erroneous exercise of discretion. *Strenke v. Hogner*, 2005 WI App 194, ¶30, 287 Wis. 2d 135, 704 N.W.2d 309 (citing *Redepenning v. Dore*, 56 Wis. 2d 129, 134, 201 N.W.2d 580 (1972)).

¶41    In arguing that the jury's entire verdict was perverse, Plaintiffs rely on an exchange between the jury and the circuit court regarding special verdict questions 9 and 10. Questions 9 and 10 asked the jury to determine the amount of damages that would compensate Sean Schaller's parents for their pecuniary losses as well as their loss of society and companionship with their son. During deliberations, the jury asked the following question: "We want to clarify that for questions 9 & 10 (damages), is it ALL defendants (Maas, Scott, & Auto Owners) or just Maas? or just Scott? It says defendants, so we had a bit of discussion about what that means." After consulting the parties, the court answered the jury's question as follows:

The damage questions differ from the negligence questions. And you may have noted on the verdict form if you find negligence on the part of Mr. Maas, then the negligence questions do ask you to allocate or apportion degrees of negligence.

That's not true with respect to damage. The focus on the damage is not the negligence of the parties, but rather the damage, total damage, regardless of who may be responsible to Ms. Neberman, to Mr. Schaller personally, and to the estate.

So negligence you allocate or apportion; damage you do not. It's the total damage to the plaintiffs.

There is a line in the jury instruction that indicates that you should not concern yourself with the outcome, in other words, you are to answer questions and then the legal judgment that's entered is based upon the answers that you give to those questions. But you should not concern yourself with what the total outcome or total judgment might be.

¶42     In its answers to special verdict questions 9 and 10, the jury awarded no damages to Sean Schaller's parents for pecuniary losses or loss of society and companionship. Plaintiffs argue that it was not enough for the circuit court to find in their favor with respect to damages; the court should have found that the perversity permeated the entire verdict, including with respect to liability.

¶43     In rejecting Plaintiffs' arguments regarding perversity of the liability verdict, the circuit court explained that any "confusion" on the part of the jury with respect to damages did not affect the jury's liability determination:

[B]oth parties fully developed the alternative [liability] scenarios. The jury simply found that the scenario that was presented by the defense was more plausible, more likely. I frankly wasn't surprised at that verdict. I thought Mr. Maas was a credible witness, I think the circumstances suggest that in good faith he found himself in a difficult position that wasn't of his own making when he started the pass.

Frankly, from the court's perspective it appeared more likely that he would have been able to complete that

18

> safely and routinely but for Mr. Scott's decision to increase the speed.… I don't see any indication that the verdict was motivated by animus or any improper attitude toward the plaintiffs.
>
> There does appear to be confusion about the damages question. As the plaintiffs pointed out in their memorandum, the jury did have a question about whether their damages answer should reflect the conduct of both Mr. Maas and Mr. Scott or just Mr. Maas. And the court answered that by indicating that the damages should reflect the joint actions of Mr. Scott and Mr. Maas. Nonetheless, the jury came back with a zero verdict. And that strikes me as confusion on the part of the jury with respect to their role in determining damages. But I see nothing in the trial or the jury's questions that would have suggested any confusion with respect to liability.

The court concluded that the liability "verdict was fully supported ... by the evidence" and that it was "highly unlikely that the verdict on liability was connected to whatever confusion may have been behind the damages verdict."

¶44    Critically, Plaintiffs do not directly address the circuit court's rationale for concluding that there was no perversity in the jury's verdict pertaining to Maas's liability. It is fatal to their argument that Plaintiffs do not identify a factual, legal, or logical error in the circuit court's reasoning. *See Strenke*, 287 Wis. 2d 135, ¶30; *see also **Dickman v. Vollmer***, 2007 WI App 141, ¶27, 303 Wis. 2d 241, 736 N.W.2d 202 (this court "uphold[s] the trial court's exercise of discretion if it examined the relevant facts, applied a proper standard of law and, using a demonstrated rational process, arrived at a conclusion a reasonable judge could reach").

¶45    Instead, Plaintiffs assert that the jury's verdict "is perverse because the answers to the special verdict questions are contrary to the evidence and the court's instructions." They question how the jury could have awarded no damages to either of Sean Schaller's parents, even though Scott was found causally

negligent (by default) and the "uncontroverted" proof established pecuniary losses and loss of society and companionship on the part of both parents. According to Plaintiffs, this shows that it "appears that ulterior considerations and prejudice rather than a reasonable application of the evidence to the court's instruction motivated the jury." Plaintiffs further argue: "Given that the jury was apparently determined to deny Plaintiffs any recovery regardless of the law, the Court's instructions, and the case's fact[s], the presumption that all of the jury's answers were affected by the jury's perversity cannot be overcome."

¶46 Plaintiffs' assertions are unpersuasive. As previously discussed, while it is true that when one aspect of a jury's verdict is perverse the rest of its verdict is *presumptively* perverse, *see Fouse*, 80 Wis. 2d at 401, it does not follow that the rest of the verdict is *automatically* perverse, *see Spath*, 41 Wis. 2d at 451-52. In fact, the presumption applies "*unless* the trial court finds otherwise and states [its] reasons for finding that the perversity is confined to one part of the verdict." *See Fouse*, 80 Wis. 2d at 401 (emphasis added). Following a review of the applicable law, the circuit court made such findings and stated its reasoning. And, as our courts have recognized: "[T]he trial court is generally in a better position to determine whether a new trial ought to be limited to a particular issue, and that observation fits particularly well the determination of whether perversity, once found, taints the entire verdict or only a part of it." *Id.* (footnote omitted). Plaintiffs have shown no reason to disturb the court's discretionary determination.

### III. Jury Instructions

¶47 Plaintiffs argue that the circuit court made two jury instruction errors: granting Defendants' requested emergency doctrine instruction and declining to give Plaintiffs' requested seatbelt instruction.

¶48 "In determining whether an instruction should be given, the evidence must be viewed in the light most favorable to the party requesting it." *Couillard v. Van Ess*, 141 Wis. 2d 459, 464, 415 N.W.2d 554 (Ct. App. 1987). However, "[f]acts of record must support the instruction and the instruction must correctly state the law." *Kochanski v. Speedway SuperAmerica, LLC*, 2014 WI 72, ¶10, 356 Wis. 2d 1, 850 N.W.2d 160. Whether a given jury instruction satisfies these criteria is a question of law, which we review de novo. *See id.* If jury instructions are erroneous, we will not order a new trial unless the error in the instructions was prejudicial. *See id.*, ¶11. A jury instruction error is prejudicial if it probably misled the jury. *Id.*

## A. Emergency Doctrine Instruction

¶49 The emergency doctrine excuses an individual's negligence so long as three requirements are met:

> "First, the party seeking the benefits of the emergency doctrine must be free from negligence which contributed to the creation of the emergency. Second, the time element in which action is required must be short enough to preclude deliberate and intelligent choice of action. Third, the element of negligence being inquired into must concern management and control before the emergency doctrine can apply."

*Totsky v. Riteway Bus Serv., Inc.*, 2000 WI 29, ¶22, 233 Wis. 2d 371, 607 N.W.2d 637 (quoted source omitted). The emergency doctrine can excuse negligence per se, such as when the driver of a motor vehicle violates a safety statute. *See id.*, ¶¶25-26.

¶50    In this case, the circuit court gave the standard emergency doctrine instruction with respect to Maas's management and control of his vehicle in the moments surrounding the accident.  *See* WIS JI—CIVIL 1105A.[7]  The court concluded that the emergency doctrine was appropriate for jury consideration because one reasonable view of the evidence suggested that Maas initiated a legal pass but was then confronted with an emergency once he saw a vehicle in the oncoming lane.  The court further explained that, at that moment, Maas had to make an "instantaneous decision." Maas could either accelerate, and try to pull ahead of Scott, or decelerate, and hope that Scott would let Maas pull in behind him; either choice involved some risk.  The court noted that increasing speed to pass posed the inherent risk of driving at higher speeds.  However, attempting to pull in behind Scott was also risky because Scott had been allegedly pacing

---

[7] Using the pattern jury instruction, the court advised the jury as follows:

> When you consider negligence as to management and control, bear in mind that a driver may suddenly be confronted by an emergency, not brought about or contributed to by his negligence.  If that happens and the driver is compelled to act instantly to avoid collision, the driver is not negligent if he makes the choice of action or inaction that an ordinarily prudent person might make if placed in the same position.  This is so even if it later appears that his choice was not the best or safest course.

> This rule does not apply to a person whose negligence wholly or in part created the emergency.  A person is not entitled to the benefit of this emergency rule unless he is without fault in creating the emergency.

> You should consider this emergency rule only … if you determine that Scott Maas was negligent as it pertains to any safety statute which involves management and control of his vehicle.

Maas's vehicle, which suggested that Scott may have blocked Maas had Maas attempted to get back into the right lane.

¶51     Plaintiffs argue that the circuit court erred in giving the emergency doctrine instruction because the evidence was insufficient under the time and negligence-free elements of the doctrine. *See Totsky*, 233 Wis. 2d 371, ¶22. Plaintiffs do not contest the management and control element of the emergency doctrine. We now address their arguments with respect to each of the two contested elements.

*1. Time Element*

¶52     As stated, under the emergency doctrine, "'the time element in which action is required must be short enough to *preclude deliberate and intelligent choice of action*.'" **Id.** (quoted source omitted; emphasis added). Plaintiffs argue that the emergency doctrine is available only when a party must make a decision "instantly" and that, here, Maas had more than an instant to decide on a course of action. In support of this argument, Plaintiffs rely on the language from the pattern jury instruction on the emergency doctrine for management and control of a vehicle, which states, in relevant part, that a driver must be "compelled to act *instantly* to avoid collision" for the doctrine to apply. *See* WIS JI—CIVIL 1105A (emphasis added). Plaintiffs also cite several cases, which they appear to argue stand for the proposition that the time element of the emergency doctrine requires an "instantaneous" decision. *See, e.g.*, **Kelly v. Berg**, 2015 WI App 69, ¶2, 365 Wis. 2d 83, 870 N.W.2d 481; **Zimmer v. Zimmer**, 6 Wis. 2d 427, 429-31, 95 N.W.2d 438 (1959).

¶53     We conclude that, viewing the evidence in the light most favorable to giving the emergency doctrine instruction, Maas's actions satisfied the time

element. *See Westfall v. Kottke*, 110 Wis. 2d 86, 102, 328 N.W.2d 481 (1983) (in reviewing whether emergency doctrine instruction should have been given, appellate court was obliged to "view the evidence in a light most favorable to the party requesting the instruction"). In reaching this conclusion, we do not address whether, as Plaintiffs contend, the time element of the emergency doctrine is limited to only decisions that must be made instantly. Instead, we assume, without deciding, that the time element contains such a limitation, but discern no error because a reasonable view of the evidence supported a conclusion that Maas had to make an instantaneous decision when he saw a vehicle coming directly at him in the left lane. *See State v. Hadaway*, 2018 WI App 59, ¶24, 384 Wis. 2d 185, 918 N.W.2d 85 ("[A]s an appellate court we decide cases on the narrowest possible grounds ....").

¶54 The crux of the parties' dispute is when the clock started for purposes of applying the emergency doctrine. Plaintiffs suggest that the period commenced at some point prior to when Maas noticed the oncoming vehicle in the left lane:

> [T]his was a gradual, escalating situation that developed over time and during which Maas had an opportunity to reconsider his course of action and his options. As described above, Maas encountered a situation where Scott sped up to block Maas, Maas in turn sped up, Scott responded by speeding up, etc. Even if, arguably, Maas had to make an instantaneous decision when Scott first began pacing him, there was time for deliberate and intelligent action <u>after</u> that initial instant.

(Record cites omitted.) However, Defendants emphasize that Maas's time in the left lane began as a legal pass, and argue that Maas did not face an emergency until he observed oncoming traffic. In response to that emergency, Defendants contend that Maas made the instantaneous decision to complete his pass and, once

he made that decision, "the decision to accelerate could not be safely undone." Defendants contend that it "is simply wrong to put Mr. Maas 'on the clock' when the 'emergency' was not at hand."

¶55   We agree with the circuit court that this is essentially a fact question for the jury.  One reasonable view of the evidence was that Maas initiated the pass at the speed limit while in the passing zone, that he observed the oncoming vehicle shortly after realizing Scott was pacing him, and that, faced with two risky options, he immediately decided to accelerate and complete the pass.  Viewing the evidence in the light most favorable to giving the emergency doctrine instruction, there was sufficient evidence to satisfy the time element.

*2. Negligence Element*

¶56   The emergency doctrine also requires that "'the party seeking the benefits of the emergency doctrine must be free from negligence which contributed to the creation of the emergency.'"  *Totsky*, 233 Wis. 2d 371, ¶22 (quoted source omitted).  Plaintiffs argue that the jury should not have been given the option to apply the emergency doctrine because, to the extent the emergency arose from the oncoming vehicle in the left lane, that emergency arose from Maas's choice to pass in a no-passing zone while exceeding the speed limit, which contributed to creating the emergency in the first place.  Defendants dispute Plaintiffs' characterization of the evidence and argue that whether Maas's negligence contributed to the creation of the emergency was a fact question for the jury.

¶57   We agree with Defendants and the circuit court that this was a question properly submitted to the jury for a determination.  As we have already discussed, Maas testified that he perceived the combination of Scott's apparently

pacing him and an oncoming vehicle as an emergency. Again, Maas admitted in his trial testimony that he *eventually* entered a no-passing zone and exceeded the speed limit. However, there was no definitive evidence about exactly *when* that happened in relation to the other events surrounding the crash. Given the inconclusive character of the evidence, both sides' theories were plausible. As a result, it was a question for the jury whether Maas was negligent in a way that *created* the emergency, or whether his conduct in speeding up and passing in a no-passing zone was excusable because it was *caused by* the emergency.

¶58 Therefore, viewing the evidence in the light most favorable to giving the emergency doctrine instruction, we conclude that the circuit court did not err in so instructing the jury.[8] *See Westfall*, 110 Wis. 2d at 102.

## B. Seatbelt Instruction

¶59 Although evidence of Sean Schaller's failure to use a seatbelt was admitted at trial without any objection by Plaintiffs, the jury was not asked to decide whether Schaller was negligent for this failure. Plaintiffs nevertheless requested a special jury instruction expressly informing the jury that it should *not* consider the fact that Sean Schaller was not wearing a seatbelt at the time of the accident.[9] The circuit court declined to give the proposed special instruction, which Plaintiffs argue was erroneous.

---

[8] Because we conclude that the circuit court did not err in giving the emergency doctrine instruction, we need not consider Defendants' alternative argument that Plaintiffs were not prejudiced by the instruction.

[9] The proposed instruction read:

**CUSTOM INSTRUCTION REGARDING PLAINTIFF'S FAILURE TO WEAR SEATBELT**

(continued)

¶60 Defendants respond that Plaintiffs forfeited the seatbelt instruction issue by not raising it in their motion after the verdict.[10] *See Suchomel v. University of Wis. Hosp. & Clinics*, 2005 WI App 234, ¶10, 288 Wis. 2d 188, 708 N.W.2d 13. Plaintiffs do not dispute that they did not raise the seatbelt instruction in their motion after the verdict, but nonetheless contend that this court should consider the issue.

¶61 However, "[t]he well-established law in Wisconsin is that 'the failure to include alleged errors in the motions after verdict constitutes a waiver of the errors.'" *Id.* (quoting *Ford Motor Co. v. Lyons*, 137 Wis. 2d 397, 417, 405 N.W.2d 354 (Ct. App. 1987)). This rule applies to alleged jury instruction errors. *See id.* As such, because Plaintiffs did not raise the alleged seatbelt instruction error in their motion after the verdict, we conclude that they have forfeited the issue.

¶62 Notwithstanding forfeiture, Plaintiffs argue that we should exercise our discretionary authority under WIS. STAT. § 752.35 to order a new trial. *See Air*

---

> You have heard testimony that Sean Schaller was not wearing his seatbelt at the time of the motor vehicle collision which resulted in his death. The court has determined that for purposes of this action, Sean Schaller's failure to wear a seatbelt did not cause his death. Accordingly, you may not let that fact affect your answers to any of the verdict questions in any way. Disregard the fact that Sean Schaller was not wearing a seatbelt and do not consider it when you determine who is responsible for Sean Schaller's death. Also do not reduce your determination of the amount of damages because of it.

[10] Although older cases, such as the one we cite in the text, sometimes use the words "forfeiture" and "waiver" interchangeably, the two words embody very different legal concepts. When the right to make an objection or assert a right on appeal is lost because of a failure to do so in the circuit court, the proper term is "forfeiture." *See State v. Ndina*, 2009 WI 21, ¶29, 315 Wis. 2d 653, 761 N.W.2d 612.

*Wis., Inc. v. North Cent. Airlines, Inc.*, 98 Wis. 2d 301, 317-18, 296 N.W.2d 749 (1980); *see also* § 752.35. Pursuant to § 752.35, we may order a new trial regardless of whether a proper motion was made "if it appears from the record that the real controversy has not been fully tried, or that it is probable that justice has for any reason miscarried." We exercise our discretionary reversal authority "sparingly and only in the most exceptional cases." *State v. Schutte*, 2006 WI App 135, ¶62, 295 Wis. 2d 256, 720 N.W.2d 469.

¶63 Although there were no questions on the verdict form regarding any fault on Sean Schaller's part and no jury instructions regarding the seatbelt defense, Plaintiffs argue that the omission of their requested seatbelt instruction created a risk that the jury would consider Schaller's failure to wear a seatbelt, thereby allowing Defendants to benefit from an "improper de facto seatbelt defense."

¶64 Plaintiffs' assertions are speculative and conclusory. They are insufficient to demonstrate that, despite Plaintiffs' failure to raise this issue in a post-trial motion, this is an exceptional case warranting a new trial. We therefore decline to exercise our discretionary reversal authority under WIS. STAT. § 752.35.

*IV. Remaining Issues*

¶65 The parties have raised two remaining issues on appeal, both of which challenge aspects of the circuit court's partial summary judgment order. Specifically, Plaintiffs appeal the circuit court's decision granting partial summary judgment in favor of Defendants on the issue of Sean Schaller's alleged pre-death pain and suffering between the time that the accident occurred and when Sean Schaller died. *See Wosinski v. Advance Cast Stone Co.*, 2017 WI App 51, ¶¶79-86, 377 Wis. 2d 596, 901 N.W.2d 797 (discussing requirements for claim of pre-

death pain and suffering). Defendants cross-appeal the circuit court's decision denying partial summary judgment on the issue of Douglas Schaller's alleged severe emotional distress as a bystander to the accident involving the death of his son. *See generally **Bowen v. Lumbermens Mut. Cas. Co.***, 183 Wis. 2d 627, 637-56, 517 N.W.2d 432 (1994) (discussing requirements for claim of negligent infliction of emotional distress in bystander cases).

¶66 We conclude that, given our decision upholding the jury's verdict determining that Maas was not negligent, we need not decide these two remaining issues. Regarding Plaintiffs' claim of Sean Schaller's pre-death pain and suffering, we note that, even if we were to resolve the issue in Plaintiffs' favor, Plaintiffs would be unable to recover any damages. As detailed in footnote 6, both parties agreed, and the circuit court concluded, that, given Scott's bankruptcy, a new trial on damages would be "futile and/or moot" if this court affirmed the jury's verdict that Maas was not negligent. Plaintiffs do not appeal this ruling and, in fact, they explicitly informed the court that they did not wish to have a new trial based solely on damages.

¶67 With respect to Defendants' cross-appeal, even if we were to agree that the circuit court should not have allowed Douglas Schaller's bystander emotional distress claim to proceed, that conclusion would have no effect on Defendants because this court has affirmed the verdicts concluding that defendant Maas was not negligent. As a result, Plaintiffs would not be able to recover from Defendants on this claim.

¶68 Accordingly, in light of our decision affirming the jury's verdict, we need not address the summary judgment issues raised by the parties.

## CONCLUSION

¶69      For the reasons stated above, we affirm the circuit court.

*By the Court.*—Judgment affirmed.

This opinion will not be published.   *See* WIS. STAT. RULE 809.23(1)(b)5.